[No. C059872. Third Dist. Nov. 23, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
GREGORY FRED ZIELESCH, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, VI & VII.

### COUNSEL

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Appellant.

### OPINION

**SCOTLAND, P. J.**—The tragic loss of life in this case illustrates the danger that faces law enforcement officers every day, even during what on the surface appear to be routine encounters.

Defendant Gregory Fred Zielesch bailed Brendt Volarvich out of jail and asked that, in return, Volarvich kill Doug Shamberger, who had been sleeping with defendant's wife. Volarvich agreed but needed a "piece" to carry out the hit. Defendant provided Volarvich with a .357 magnum revolver and $400 to purchase some methamphetamine. The next day, while driving back to defendant's house, Volarvich was stopped by California Highway Patrol Officer Andrew Stevens for a traffic violation. High on methamphetamine and afraid of being sent back to jail, Volarvich shot and killed Officer Stevens with defendant's gun when the officer walked up to the driver's window and greeted Volarvich with a friendly, "How are you doing today?"

Defendant was convicted of the first degree murder of Officer Stevens, conspiracy to commit the murder of Doug Shamberger, and other offenses and enhancements not relevant to the issues raised on appeal. He was sentenced to state prison for an indeterminate term of 50 years to life (two consecutive terms of 25 years to life), plus a consecutive determinate term of seven years. He appeals.

In the published parts of this opinion, we reject defendant's contentions that his murder conviction must be reversed because the shooting of Officer Stevens was not in furtherance of the conspiracy to kill Shamberger and "was both unforeseen and unforeseeable," and that the entire judgment must be reversed because he was denied his right to a fair trial when the judge

allowed courtroom spectators to wear buttons displaying a color photograph of Officer Stevens for six days at the start of trial.

■ As we will explain, when defendant bargained for the assassin's services and armed him with a gun and money to buy methamphetamine, defendant knew that the assassin had an unstable personality, with the "mentality" to kill someone other than the intended victim of the assassination. Defendant also knew that the assassin had just been released from jail, was on searchable probation, and would not want to be returned to custody if a law enforcement officer found the assassin in possession of methamphetamine and defendant's gun. From these facts, jurors reasonably could conclude the coldblooded murder of Officer Stevens was a natural and probable consequence of the conspiracy to kill Shamberger because a reasonable person, knowing what defendant knew, would recognize that if the unstable, methamphetamine using, and armed assassin detained by a law enforcement officer before the assassination was completed, it was likely that he would kill the officer to avoid arrest and complete his mission.

And it is an insult to the intelligence and integrity of jurors to suggest that, despite the judge's admonition not to be influenced by buttons worn by some of the courtroom spectators, the jurors would have been so influenced by the buttons that they would be unable to base their verdict solely on evidence presented at trial. Nothing about the buttons was coercive or intimidating, and we have no doubt that the verdicts would have been the same if the trial court had not allowed the spectators to wear the buttons during the first six days of this eight-week trial.

In the unpublished parts of our opinion, we reject defendant's other claims of reversible error. Consequently, we shall affirm the judgment.

## FACTS

On the afternoon of November 17, 2005, Officer Stevens stopped Volarvich on a road outside of Woodland, California. Stevens approached the vehicle, lowered his head towards the driver's side window, and greeted Volarvich with a friendly, "How are you doing today?" Volarvich responded, "Pretty good," then shot Stevens in the face with a Taurus .357 magnum revolver. Death was instantaneous. Stevens collapsed on the side of the road, and Volarvich drove away.

The events that culminated in the murder of Officer Stevens began three days earlier at a motel in Woodland, where Volarvich and his girlfriend, Rebecca Pina, were staying. After a night of using methamphetamine, they failed to check out of the motel at the scheduled time on November 14.

Woodland police officers, summoned to evict the holdover tenants, discovered marijuana on Pina and brass knuckles and methamphetamine on Volarvich. The officers arrested Volarvich.

Pina, who had been involved in an intimate relationship with defendant, drove Volarvich's car to defendant's house and asked for help with bail for Volarvich. Defendant reluctantly agreed and ultimately arranged a deal with a local bail bondsman whereby defendant would cosign for the full amount of the $10,000 bond and pay $300 of the $1,000 bond premium, and Volarvich would pay the remaining $700 after he was released from jail.

When Volarvich was released from jail on November 16, defendant and Pina took Volarvich to defendant's house, where they "got high" on methamphetamine with Lindsey Montgomery, one of Pina's friends.

That afternoon, Volarvich and Pina gave defendant a ride to the Yolo County courthouse, where defendant attended a custody hearing regarding defendant's children with his estranged wife, Michelle. Michelle was living with Doug Shamberger, whom defendant "hated" and considered to be an "asshole." Defendant suspected that both Michelle and Shamberger had burglarized his house; and Shamberger had threatened defendant several times because Michelle paid periodic visits to defendant. In response to these threats, defendant bought a Taurus .357 magnum to protect himself from Shamberger.

On the way back to defendant's house following the custody hearing, defendant told Volarvich that he could "take care of" Shamberger as payment for defendant's having bailed Volarvich out of jail. When Volarvich remarked that he "needed a piece," defendant replied he "had that taken care of." Volarvich asked: "[D]o you want Michelle done?" Defendant said no. Upon arriving at the house, the threesome again got high, and defendant gave Volarvich the .357 magnum Taurus revolver and $400 to pick up some more methamphetamine in Roseville.

At this point, Volarvich and Pina got into a heated argument. Volarvich called Montgomery, arranged to go to her house, and left defendant's house alone. He then picked up Montgomery and drove to a hotel in Rocklin. En route, Volarvich told Montgomery that defendant had given him a gun because defendant "wanted [Shamberger] taken out." After checking into a hotel room,[1] Volarvich pulled defendant's gun out of a black bag to show Montgomery and started playing with the revolving chamber. Later that night,

---

[1] Volarvich and Montgomery were not old enough to rent the hotel room. Thus, Volarvich called an older friend, Ryan Nicholson, and arranged for Nicholson's girlfriend, Erin Owen, to rent the room in exchange for gas money.

Volarvich and Montgomery went to Wal-Mart, where Volarvich bought a laser sight. Back at the hotel room, Volarvich unsuccessfully attempted to attach the laser sight to the gun with electrical tape. He then tried to Super Glue the laser sight to the gun; this attempt also failed. Because Volarvich was afraid of sleeping past checkout time and being sent back to jail, he and Montgomery stayed up all night.

After leaving the hotel the morning of November 17, Volarvich and Montgomery went to a friend's house and smoked methamphetamine. They then drove back to Montgomery's house in Woodland. As Volarvich drove across the I-5 causeway, he pulled out the gun and started playing with the revolving chamber, spinning the chamber and loading it with bullets. Afraid she would get in trouble because Volarvich was playing with a gun while they drove down the causeway, Montgomery told him to put the gun down. Volarvich complied, placing it on the driver's side floorboard. They smoked more methamphetamine when they arrived at Montgomery's house.

Meanwhile, Pina was still at defendant's house. Furious that Volarvich had not returned with the methamphetamine he was supposed to buy the night before, defendant hit Pina in the head to rouse her from sleep and yelled that, because of her, Volarvich did not come back and that defendant "was out $400 plus the money for the bail bondsman." Unable to connect with Volarvich through his cell phone, Pina called Montgomery, told her that defendant had hit her because Volarvich had not returned, and asked if she had heard from him. Montgomery told Pina that she would "try to get ahold of him." At Montgomery's request, Volarvich called Pina and told her that he was on his way to pick her up.

When Volarvich left Montgomery's house, he was "upset" that defendant had hit Pina. Volarvich brought the gun with him because "he was worried that it was going to be a setup" and he did not want to go back to jail. According to Montgomery, Volarvich believed that either defendant or the bail bondsman was setting him up because he had taken defendant's $400 without returning with the methamphetamine and had not met with the bail bondsman the day before to sign the bond paperwork.

Apparently on his way to defendant's house to pick up Pina, Volarvich used defendant's .357 magnum revolver to shoot and kill Officer Stevens, after Volarvich was pulled over by Stevens.

After the shooting, Volarvich called Montgomery, said that he "fucked up," asked if she could hear sirens, but hung up the phone before explaining further. When Volarvich called Montgomery back, he asked her to pick him up on El Dorado Drive. She agreed, borrowed a friend's car, and found

Volarvich standing behind his car holding the license plate. Volarvich and Montgomery then switched cars and drove a short distance to Delta Drive, where they left Volarvich's car and returned to Montgomery's house. On the way to the house, Montgomery noticed that the black bag which had contained the gun was missing. When she asked Volarvich what had happened to it, he explained that he "had to get rid of the gun" and buried it near County Road 96 and County Road 24, which is precisely where the gun was found the next day. Montgomery also overheard Volarvich on the phone telling his mother that he had "shot the cop" but "didn't know if he was serious or not" and thought that "he was just tweaking." Volarvich then called two friends and secured a ride from Woodland to Roseville. During the drive, Volarvich again said he "had shot a cop," and added he did so because "he didn't want to go to jail."

When defendant told Pina an officer had been shot, she turned on the television and saw the news broadcast about the killing. She asked whether he had given Volarvich his gun. Defendant replied that Volarvich's "mentality was there."

Meanwhile, Montgomery received a call from Volarvich telling her to buy window decals to disguise his car. Acceding to Volarvich's request, Montgomery bought decals and window tinting from Wal-Mart, returned to Delta Drive to retrieve the car, and reattached the license plate that Volarvich had apparently removed. After receiving another call from Volarvich informing her where to meet him, Montgomery drove Volarvich's car back to the hotel in Rocklin.[2] There, Volarvich confessed to Montgomery, explaining that when he was pulled over by Officer Stevens, "he just turned and shot him." According to Volarvich, he was "scared" because he "didn't want to go to jail" and believed that being pulled over was part of a setup orchestrated by the bail bondsman.

Volarvich and Montgomery were arrested at the hotel during the early morning hours of November 18, the same day that defendant was arrested after his house was searched and officers discovered a rifle, methamphetamine, and drug paraphernalia. During questioning, defendant confirmed the antagonistic relationship between himself and Shamberger, and admitted that he had purchased the Taurus .357 magnum revolver in order to protect himself from Shamberger. But he denied asking Volarvich to kill Shamberger and denied giving Volarvich the gun that killed Officer Stevens. According to his version of events, defendant merely showed Volarvich the gun the night before the shooting and discovered that it was missing the next morning.

---

[2] Volarvich again rented the hotel room through Nicholson and Owen, and told them he "killed an officer" and that he "fucked up" and "blasted him in the face." He also told Nicholson that the reason he shot Officer Stevens was that he "didn't want to go back to jail."

## DISCUSSION

## I

Defendant asserts that his murder conviction must be reversed because the shooting of Officer Stevens was not in furtherance of the conspiracy to kill Shamberger and "was both unforeseen and unforeseeable." Defendant is mistaken.

■ The law has been settled for more than a century that each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design. (*People v. Medina* (2009) 46 Cal.4th 913, 920 [95 Cal.Rptr.3d 202, 209 P.3d 105]; *In re Hardy* (2007) 41 Cal.4th 977, 1025–1026 [63 Cal.Rptr.3d 845, 163 P.3d 853]; *People v. Smith* (1966) 63 Cal.2d 779, 794 [48 Cal.Rptr. 382, 409 P.2d 222]; *People v. Harper* (1945) 25 Cal.2d 862, 870 [156 P.2d 249]; *People v. Kauffman* (1907) 152 Cal. 331, 334 [92 P. 861] (hereafter *Kauffman*); see also *Pinkerton v. United States* (1946) 328 U.S. 640, 647–648 [90 L.Ed. 1489, 1496–1497, 66 S.Ct. 1180] (hereafter *Pinkerton*).)

■ Recognizing that criminal agency poses a greater threat to society than that posed by an independent criminal actor, the law "seeks to deter criminal combination by recognizing the act of one as the act of all." (*People v. Luparello* (1986) 187 Cal.App.3d 410, 437 [231 Cal.Rptr. 832]; see also *People v. Zacarias* (2007) 157 Cal.App.4th 652, 658 [69 Cal.Rptr.3d 81] ["conspiracy to commit a target offense makes it more likely that additional crimes related to the target offense will be committed"].) "In combining to plan a crime, each conspirator risks liability for conspiracy as well as the substantive offense; in 'planning poorly,' each risks additional liability for the unanticipated, yet reasonably foreseeable consequences of the conspiratorial acts, liability which is avoidable by disavowing or abandoning the conspiracy." (*People v. Luparello, supra*, 187 Cal.App.4th at p. 438.)

■ The question whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime "is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable." (*People v. Medina, supra*, 46 Cal.4th at p. 920.) To be reasonably foreseeable " ' "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . ." " [Citation.]' " (*Ibid.*) Whether the unplanned act was a "reasonably foreseeable consequence" of the conspiracy must be "evaluated under all the factual

circumstances of the individual case" and "is a factual issue to be resolved by the jury" (*ibid.*), whose determination is conclusive if supported by substantial evidence (*Kauffman, supra,* 152 Cal. at p. 335; *People v. Luparello, supra,* 187 Cal.App.3d at p. 443).

Properly treating the issue as a question of fact, the trial court instructed the jury with CALCRIM No. 417.[3] After requesting clarification on the meaning of certain language in the instruction ("in order to further the conspiracy" and "likely to happen if nothing unusual intervenes"), the jurors informed the trial court that they had reached verdicts on all counts except the murder charge alleged against defendant.

The trial court then allowed the parties to present supplemental closing arguments focusing solely on whether the murder of Officer Stevens was committed in furtherance of, and followed as a probable and natural consequence of, the conspiracy. The People argued the murder furthered the goals of the conspiracy because, in order to successfully murder Shamberger, one of the goals of the conspiracy had to be to avoid detection; and the murder was a natural and probable consequence of the conspiracy because "a reasonable person would foresee that there would be police intervention" at some point during the execution of the plot to kill Shamberger, and defendant, with actual knowledge of Volarvich's "volatile and unstable" nature, gave him the gun to carry out the murder. Defendant's attorney argued no conspiracy existed between defendant and Volarvich; being pulled over by an officer on a country road in Woodland constituted an "extremely unusual" event, the intervention of which rendered Officer Steven's death not a natural and probable consequence of the alleged conspiracy; and Volarvich killed Officer Stevens because "he did not want to go to jail," not because of a conspiracy to kill Shamberger.

---

[3] CALCRIM No. 417, as given to the jury in this case, provides: "A member of a conspiracy is criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan. [¶] To prove that defendant Gregory Fred Zielesch is guilty of [the murder of Officer Stevens], the People must prove that: [¶] One, defendant Gregory Fred Zielesch conspired with defendant Brendt Volarvich to commit the murder of Doug Shamberger; [¶] Two, Brendt Volarvich, as a member of the conspiracy to murder Doug Shamberger, committed the murder of Andrew Stevens in order to further the conspiracy to murder Doug Shamberger; and [¶] Three, the murder of Andrew Stevens was a natural and probable consequence of the common plan or design of the crime that both defendants Zielesch and Volarvich conspired to commit."

After further deliberation, the jury found defendant guilty of both the conspiracy and murder charges, implicitly finding the murder of Officer Stevens was committed in furtherance of, and followed as a natural and probable consequence of, the conspiracy.

As he did in the trial court, defendant claims the murder of Officer Stevens "was both unforeseen and unforeseeable." We conclude the jury's contrary finding is supported by substantial evidence. The object of the conspiracy between defendant and Volarvich was to end the life of defendant's nemesis with the .357 magnum revolver supplied by defendant for that purpose. Defendant knew Volarvich had a proclivity for using methamphetamine, having used the drug with Volarvich the night before he gave him the gun to carry out the hit, and having given Volarvich $400 to purchase more methamphetamine. Defendant admitted knowing Volarvich had an unstable personality; after receiving news of Officer Stevens's murder, defendant told Pina that Volarvich's "mentality was there." Defendant also had reason to know that Volarvich, who was on searchable probation, would be taken into custody if a law enforcement officer detained him and found the gun. From these facts, the jury could find that a natural and probable consequence, i.e., a reasonably foreseeable "possible consequence" of defendant's conspiracy with assassin Volarvich to murder Shamberger (*People v. Medina, supra*, 46 Cal.4th at p. 920) was that, if Volarvich was detained by a law enforcement officer before completing the job, Volarvich would kill the officer to avoid arrest and complete his mission to assassinate Shamberger.

Indeed, given defendant's knowledge of Volarvich's unstable mental state, use of methamphetamine, and desire not to return to jail, we conclude the prospect that defendant's arming Volarvich with defendant's .357 magnum revolver to assassinate Shamberger would lead to the shooting of a law enforcement officer is just as foreseeable as was the murder that the California Supreme Court recently held to be the natural and probable consequence of a "failed assault" by gang members who had been disrespected by a rival gang member. (*People v. Medina, supra*, 46 Cal.4th at pp. 923–925.)

■ Defendant's argument that the murder of Officer Stevens with defendant's gun was not "in furtherance of the charged conspiracy" does not benefit him for two reasons. First, a natural and probable consequence of a conspiracy need not be an act in furtherance of the conspiracy; it simply must be a " 'reasonably foreseeable consequence of the [intended crime] aided and abetted.' [Citation.]" (*People v. Medina, supra*, 46 Cal.4th at p. 920.) Second, although Volarvich was not on his way to carry out the assassination of Shamberger when Volarvich was pulled over by Officer Stevens, and although there is evidence that Volarvich was upset with defendant for hitting Pina, the jury was not required to conclude that the conspiracy to murder Shamberger

had reached an end. Volarvich still "owed" defendant for bailing him out of jail and for the $400 given to him the previous day to purchase methamphetamine, and Volarvich still possessed the gun given to him by defendant to assassinate Shamberger. Thus, the jury could reasonably have concluded that the conspiracy to murder Shamberger persisted despite Volarvich's anger at defendant, and that the hit would be carried out whenever the opportunity presented itself. The jury could also have concluded, quite reasonably, that a simultaneous goal of the conspiracy to assassinate Shamberger was to avoid detection and forcibly resist arrest. (*People v. Durham* (1969) 70 Cal.2d 171, 185 [74 Cal.Rptr. 262, 449 P.2d 198]; *People v. Lapierre* (1928) 205 Cal. 470, 471 [271 P. 500].) In fact, when Volarvich was pulled over by Officer Stevens, he correctly concluded that, unless he took drastic action with the gun given to him by defendant, Volarvich was going back to jail. Thus, the jury could reasonably have found that, because Volarvich would not have been able to complete his assignment from a jail cell, avoiding arrest at any cost furthered the murderous goal of the conspiracy by giving Volarvich more time to find the target.

■ Defendant points out "there appear to be no cases like this one," and posits the reason for the dearth of appellate decisions dealing with this factual scenario is "this case is far outside the scope of Kauffman and Pinkerton." (See *Kauffman, supra*, 152 Cal. 331; *Pinkerton, supra*, 328 U.S. 640 [90 L.Ed. 1489].) We are not persuaded. While it may be possible to imagine scenarios in which the conduct of an assassin is so outrageous and unpredictable that it falls outside the scope of a conspiracy to commit murder, one who bargains for an assassin's services, and then arms the assassin with a gun, takes the assassin as he finds him. If the hired killer is an unstable methamphetamine user who, before the assassination is completed, finds it necessary to kill a law enforcement officer to avoid being sent back to jail, the conspirator who hired and armed the assassin is guilty not only of conspiracy to murder the intended target, but also the murder of the peace officer. It would be a rare case indeed where a murder is an unforeseeable result of a conspiracy to commit murder.

## II–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V

We also reject defendant's claim that his right to a fair trial was infringed because, for a period at the start of trial, the judge allowed courtroom spectators to wear buttons displaying a photograph of Officer Stevens.

*See footnote, *ante*, page 731.

## A

On the first day of trial, Wednesday, February 13, 2008, Volarvich's counsel brought to the court's attention that "some folks in the audience are wearing buttons, which fairly bear the image of Officer Stevens." Understanding their desire to "express their sympathy for Officer Stevens and his family," counsel voiced concern that the buttons "may have some undue influence on the jurors." Thus, counsel asked the court to "direct folks, if they are going to be members of the audience, to please remove those buttons."

The following day, Thursday, February 14, 2008, outside the jury's presence, the trial judge described the button: "It is about two to two-and-a-quarter inches in diameter. It is a color photograph of Officer Stevens. I can't tell if he's in uniform or not. It is from chest level up showing primarily his face with the American flag in the background. And then it says Officer Andrew Stevens." The judge then allowed counsel to address the issue. Citing the United States Supreme Court's decision in *Carey v. Musladin* (2006) 549 U.S. 70 [166 L.Ed.2d 482, 127 S.Ct. 649], Volarvich's attorney said "it is an open question whether or not a spectator as opposed to state conduct in the courtroom can violate the right to a fair trial," but argued the fact that "these badges have been passed out by the Highway Patrol" satisfied any state action requirement. After Volarvich's counsel offered to submit evidence regarding the California Highway Patrol's involvement in distributing the buttons, the judge said that he was not concerned about whether a state actor distributed the buttons. This was so because the judge rejected the notion that "if state action isn't involved in wearing buttons or having placards or anything of that nature, then the Court has no authority and/or responsibility to control what happens in the courtroom." Rather, the judge explained, his "responsibility and the responsibility of all the security staff is to make sure that we maintain the kind of decorum in the courtroom that we should have for a case of this gravity."

Accordingly, the judge framed the issue as "whether or not the communication from members of the audience is in any sense coercive or intimidating so that it might affect the decisions that the jury has to make in this case." In this regard, the judge observed that the buttons did not relate "overtly to the subject matter of this trial" and served only as "a memorial or an expression of sympathy" for Officer Stevens and his family. The judge also noted that such an expression of sympathy was not inconsistent with the defense of either Volarvich or defendant as both defense attorneys, in opening statements, described the death of Officer Stevens as "tragic or sad," and neither suggested that the death was not a "homicide of some sort."

Thus, the judge "decided [to] follow a suggestion that was made [in *People v. Houston* (2005) 130 Cal.App.4th 279 [29 Cal.Rptr.3d 818]]" and

instruct the jurors as follows: "I want to make sure that you realize that nothing that the audience says or does—in fact, nothing that anybody does who's not a sworn witness can be used as evidence in this case, so realize that that badge is no more evidence than anything else that you might see on the street or anywhere else. I've already told you that you can only use the testimony and evidence that's admitted here in court, and that does not include any communication that you might get from the badges themselves; but there's a second issue that could conceivably arise by seeing the badges. [¶] You might feel sympathetic or even empathetic in reaction to seeing Officer Stevens's photograph. Remember that your responsibility when you deliberate in this case is to make your decisions without any [e]ffect from sympathy or passion or prejudice. Those decisions have to be impartial, objective decisions, so I want to make sure that you're sensitized to the fact that sympathy can't play any part in decisions that you ultimately have to make in this case."

The judge also set a deadline after which the buttons would no longer be worn "so that there won't be any ongoing [e]ffect on the jurors." Outside the presence of the jury, the judge informed the audience that, beginning Tuesday, February 26, 2008, the buttons would no longer be allowed into the courtroom. Prior to the court-imposed deadline, the jury was exposed to the buttons bearing Officer Stevens's likeness on the first six days of an eight-week trial.

### B

Defendant contends the trial court's "failure to stop the wearing of the buttons when first requested by the defense was error" that deprived him of his right to "a trial before an impartial jury untainted by an inflammatory courtroom atmosphere." We disagree.

█ "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." (*Estelle v. Williams* (1976) 425 U.S. 501, 503 [48 L.Ed.2d 126, 130, 96 S.Ct. 1691]; see *People v. Taylor* (1982) 31 Cal.3d 488, 494 [183 Cal.Rptr. 64, 645 P.2d 115].) Because the presumption that a defendant is innocent until proved guilty is a "basic component of a fair trial under our system of criminal justice," "courts must be alert to factors that may undermine the fairness of the fact-finding process" and "must carefully guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." (*Estelle v. Williams, supra*, 425 U.S. at p. 503 [48 L.Ed.2d at p. 130].)

■ "Some courtroom practices are so inimical to the presumption of innocence that they violate defendants' due process rights. Compelling a defendant to appear at trial in prison garb is impermissible because the constant reminder of the defendant's incarcerated status may affect jurors' perception of him or her as a wrongdoer. [Citations.] Unnecessary shackling or gagging of a defendant during trial is improper for the same reason. [Citations.] The deployment of excessive numbers of security personnel in a courtroom also can undermine the presumption of innocence. [Citations.]" (*U.S. v. Olvera* (9th Cir. 1994) 30 F.3d 1195, 1196; see *Holbrook v. Flynn* (1986) 475 U.S. 560, 567–568 [89 L.Ed.2d 525, 533–534, 106 S.Ct. 1340]; *Estelle v. Williams, supra*, 425 U.S. at p. 504 [48 L.Ed.2d at p. 130].)

On the other hand, allowing some courtroom spectators to wear commemorative buttons depicting the likeness of a fallen officer is not unduly suggestive of guilt. Defendant's claim to the contrary is an insult to the intelligence, integrity, and resolve of jurors. Here, there is no reason to believe that the jurors, when faced with the image of a fallen officer, would be unable or unwilling to base their verdict solely on the evidence presented during the trial.

Moreover, jurors were instructed by the court to disregard the buttons, to not allow sympathy for Officer Stevens to play a role in their decision regarding the guilt or innocence of either defendant, and to base their verdict solely on evidence presented during the trial. We presume that the jury followed this admonition. (*People v. Houston, supra*, 130 Cal.App.4th at p. 312 [nearly identical admonition held to cure any inherent prejudice presented by nearly identical buttons worn by audience members].) In addition, the court barred the wearing of the buttons during the last five weeks of trial.

Consequently, we conclude the wearing of the buttons presented no "probability of deleterious effects" on the defendant's right to a fair trial. (*Estelle v. Williams, supra*, 425 U.S. at p. 504 [48 L.Ed.2d at p. 130].) Simply stated, we find beyond a reasonable doubt that the verdicts would have been the same even if the court had precluded spectators from wearing the buttons at the beginning of the trial.

VI, VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 731.

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Robie, J., concurred.

On December 3, 2009, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 10, 2010, S178863. Kennard, J., Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.