Filed 4/14/14  P. v. Burton CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238653 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA347302) |
| v. | |
| JOSHUA BURTON et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Burton.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Mitchell.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Sonya Roth, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Joshua Burton and Anthony Mitchell, appeal their convictions for first degree murder with a multiple murder special circumstance, second degree murder, burglary and robbery, with firearm use and criminal street gang enhancements (Pen. Code, §§ 187, 190.2, subd. (a)(3), 459, 211, 12022.53, 186.22, subd. (b)).[1] They were sentenced to state prison for terms of life without possibility of parole.

The judgments are affirmed in part, reversed in part, and remanded for resentencing.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

On December 24, 2007, Los Angeles Police Detective Stephanie Rosa responded to a homicide call at 6733 11th Avenue in Los Angeles. Upon arrival, Rosa and her partner entered apartment number 6 and found Shelton Summerall dead on the living room floor, and Monica Youngblood dead in the bedroom. There were two .45-caliber cartridge casings in the living room and one in the bedroom. The autopsies showed Summerall had sustained three fatal gunshot wounds, two to the head and one to the chest, and Youngblood had sustained a single fatal gunshot wound to the head.

On January 10, 2008, Detective Rosa met with A.A., who lived in the same apartment complex as Summerall. On the night of the killings, A.A. saw defendants Mitchell and Burton knocking on Summerall's door at about midnight. Burton went into Summerall's apartment, followed by Mitchell five minutes later. About 10 minutes after that, A.A. heard gunshots. A.A. later saw the defendants leave Summerall's apartment through a back window.

---

[1]     All further references are to the Penal Code unless otherwise specified.

2

B.B. testified Summerall was an old friend who occasionally hired him to do chores around the apartment. B.B. had been inside Summerall's bedroom and observed his five or six watches. B.B. particularly liked "a purple watch with diamonds inside." Summerall kept money in a shoebox in his bedroom. B.B. knew Summerall made his living selling crack cocaine.

On the night of the shootings, B.B. was visiting his friend C.C. who lived in the same apartment complex as Summerall. When B.B. and C.C. walked into the building late that night, they saw the defendants standing outside. Burton asked C.C. if he and B.B. "want[ed] to work." After C.C. declined this invitation, he and B.B. went into C.C.'s apartment. Shortly thereafter, B.B. saw the defendants knocking on Summerall's door. He then heard five gunshots and later saw Mitchell carrying Summerall's shoebox in a clear bag. A few days later, B.B. saw Mitchell wearing Summerall's watch. According to B.B., Burton bought a brand new Cadillac after the killings.

D.D., a Rolling 60's gang member who was a close friend of Summerall's, testified that a few days before the killings he witnessed a discussion between the defendants and a high-ranking gang member named Scooby. Asked if Scooby was a "shot-caller," D.D. testified, "You could say he was" because he had "authority over anybody." Scooby told the defendants Summerall "shouldn't be selling drugs like he is because nobody could make money." Scooby also said, "Something's got to be done," which meant Summerall had to be killed. D.D. left and called Summerall to warn him that Scooby was out to get him. The next time D.D. saw Mitchell, after the killings, Mitchell tried to sell him Summerall's diamond watch. D.D. also saw Mitchell driving a brand-new Impala.

The prosecution's gang expert testified the Rolling 60's are the largest gang in Los Angeles with 1,200 documented members, 600 of whom are active. Because of its size, there are various cliques within the gang and tensions can arise between them. The defendants were self-admitted members of the Rolling 60's who belonged to the Brynhurst clique, the same clique to which D.D. belonged. Summerall was also a Rolling 60's member, but he belonged to the Front 60's clique. Scooby was from still

3

another clique called the Avenues.  The gang expert was acquainted with Summerall, who was always well-dressed, owned various cars including a brand new Corvette, and carried around thousands of dollars in cash.  Asked to assume Summerall had been dealing drugs from his apartment, which was in territory controlled by another clique of the same gang, the expert opined the killings had been committed for the benefit of the Rolling 60's gang because members of the other cliques would have felt disrespected and threatened by the fact Summerall had been depriving them of drug profits.  In addition, the young gang members doing the killing would gain status for having successfully carried out the orders of a senior gang member.

The gang expert was asked the following hypothetical question:  "[A]ssume there's two Rolling 60s from a particular clique that go commit a violent crime against a member of a rival clique or a clique within Rolling 60s that is sometimes rival with them.  We have only one shooter during the course of that violent crime.  What is the role of the non shooter, assuming they're working together?"  The expert replied, "The non shooter . . . is there for help in case things go sideways. . . . [and] to make sure there's no witnesses or police within that area when the crime is committed."  Asked what might be the consequences for an innocent bystander who happened to witness this violent crime, the expert answered:  "that person getting killed, because they don't want any witnesses being present, because they don't want that to be leaked to the police"  Asked a hypothetical question based on the particular facts of this case, the expert opined that killing the potential eyewitness would have been done for the gang's benefit:  "They kill [the intended target], and then they kill the witness because, obviously, that witness was a threat to them because they [*sic*] saw their faces or saw the crime when it happened, so they want nobody to be able to testify against them or report them to [the] police."

2. *Defense evidence.*

Dyran Culpepper testified he lived in the apartment next door to Summerall, and Burton lived with his girlfriend in the same building. On the night of the killings, Culpepper was in front of the building when he heard gunshots. Walking over to see if anyone had been injured, Culpepper saw Burton peeking out of his apartment door. Culpepper knocked on Summerall's door, but left when no one answered. The next day he went into the apartment and found Summerall's body.

Shambrea Butler is the mother of Burton's child. She lived with Burton in an upper-floor apartment in the same complex as Summerall. On the night of the killings, she and Burton were watching television when they heard gunshots. They went downstairs together and saw Culpepper walking into the building. Culpepper asked if Burton had heard anything. After a minute, Butler and Burton went back upstairs. Butler testified Burton did not purchase a new Cadillac. Butler's mother had an old model white Cadillac which Burton drove on occasion.

Quiondra Blockman is the mother of Mitchell's child. On the night of the killings, Mitchell was with Blockman at a party from 1:00 p.m. until 11:00 p.m. After getting home, they washed and fed the baby and then went to sleep. The baby awoke every few hours after that and Mitchell would get up to feed and tend to him. Mitchell was there all night and did not leave the apartment until the next afternoon.

A defense gang expert testified shot-callers do not have authority over members from other cliques. A gang member's reputation would not be enhanced by killing a fellow gang member; indeed, it could hurt his standing in the gang. It was doubtful a gang member would allow a rival clique member or the friend of a targeted individual to be present during a discussion about murdering someone.

5

**CONTENTIONS**

1. The trial court erred by failing to instruct the jury, sua sponte, with CALCRIM No. 417 on the natural and probable consequences of a conspiracy.

2. The trial court erred by failing to instruct the jury, sua sponte, with CALCRIM No. 358 on viewing a defendant's extra-judicial statements with suspicion.

3. There was cumulative error.

4. Defendants' burglary sentences constituted improper multiple punishment under section 654.

5. Defendants' sentences on counts 3 and 4 are invalid.

6. Defendants' life-without-possibility-of-parole sentences on count 2 are invalid.

**DISCUSSION**

1. *Trial court erred by failing to instruct on CALCRIM No. 417.*

Defendants contend their second degree murder convictions for killing Youngblood (count 2) must be reversed because the trial court failed, sua sponte, to instruct the jury with CALCRIM No. 417 on the natural and probable consequences of a conspiracy. Although the trial court erred by failing to give this jury instruction, the error was harmless.

a. *Background*.

At a jury instruction conference, the prosecutor asked the trial court to give CALCRIM No. 416 (evidence of uncharged conspiracy), which states in pertinent part: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." The prosecutor argued this instruction was warranted because the evidence showed Scooby had ordered Summerall's killing and both defendants entered Summerall's apartment, but "we don't know who the shooter is, if they both were or not."

6

When the trial court asked if the prosecutor also wanted CALCRIM No. 417 (liability for coconspirators' acts based on principle of natural and probable consequences) the following colloquy occurred:

"[The prosecutor]: I'm not asking for natural and probable consequences because I think the object of the conspiracy was murder. I don't think there was a target crime and then it just became a murder through circumstances during the course of a robbery or whatnot.

"The Court: Or to beat him up.

"[The prosecutor]: That type of thing. [¶] It was clearly – the intent, based on the evidence, was to go in there and kill him. [¶] So I think [CALCRIM No.] 417 when we say a member of a conspiracy –

"The Court: I think we don't need it then because [CALCRIM No.] 416, the second sentence says a member is criminally responsible for acts of other members. [¶] . . . I [don't] think we need [CALCRIM No.] 417 for just that reason."

The trial court later noted: "People are requesting [CALCRIM No.] 416, which I'm giving over vigorous defense objection." The trial court did not give CALCRIM No. 417, which would have told the jury: "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime. [¶] *A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy.* This rule applies even if the act was not intended as part of the original plan. . . . [¶] A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (First italics added.)

7

b. *Standard of Review*.

"Whether or not to give any particular instruction in any particular case entails the resolution of a mixed question of law and fact that, we believe, is however predominantly legal. As such, it should be examined without deference." (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) The failure to instruct on an element of an offense is subject to *Chapman*[2] harmless error analysis. (See *Neder v. United States* (1999) 527 U.S. 1, 18 [119 S.Ct. 1827] ["Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"].)

c. *Discussion*.

Mitchell argues the trial court erred by failing to couple CALCRIM No. 416 with either CALCRIM No. 417 or some equivalent instruction because "[t]he evidence supported a reasonable doubt as to which of two scenarios occurred: (1) both defendants were involved in the killing of Monica Youngblood . . . or (2) while one defendant was in the living room, the other defendant found Ms. Youngblood in the bedroom and killed her without the other defendant's even knowing of her presence before she was killed. In the latter scenario, it was for the jury to decide whether or not Ms. Youngblood's killing was a natural and probable consequence of the . . . conspiracy to kill [Summerall]."

Mitchell acknowledges there was evidence the defendants conspired to murder Summerall at Scooby's behest and went to Summerall's apartment to carry out the plan, but he argues there was no evidence any member of the conspiracy contemplated Youngblood's presence at the scene. Moreover, he argues, "[t]here was no evidence as to what either . . . Mitchell or Burton *individually* did, saw, heard, or said in [Summerall's] apartment." As a result, Mitchell asserts, the natural and probable consequences doctrine was essential to gauge the defendants' culpability for killing Youngblood because she was not an obvious target of the conspiracy.

---

[2] *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824].

" 'The general rule is well settled that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates or confederates committed in furtherance of any prosecution of the common design for which they combine.  In contemplation of law the act of one is the act of all.  Each is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan.  Nevertheless the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.  Even if the common design is unlawful, and if one member of the party departs from the original design as agreed upon by all of the members, and does an act which was not only not contemplated by those who entered into the common purpose, but was not in furtherance thereof, and not the natural or legitimate consequence of anything connected therewith, the person guilty of such act, if it was itself unlawful, would alone be responsible therefor." (*People v. Kauffman* (1907) 152 Cal. 331, 334.)  "*[W]hether or not the act committed was the ordinary and probable effect of the common design or whether it was a fresh and independent product of the mind of one of the conspirators, outside of, or foreign to, the common design, is a question of fact for the jury*, [citations]." (*Id*. at p. 335, italics added.)

In *People v. Zielesch* (2009) 179 Cal.App.4th 731, Zielesch bailed Volarvich out of jail and asked him, in return, to kill the man who had been sleeping with Zielesch's wife.  Zielesch furnished Volarvich with a gun and $400 to buy methamphetamine.  The next day, Volarvich was stopped by a CHP officer for a traffic violation.  High on the methamphetamine, and afraid of going back to jail, Volarvich shot and killed the officer without any provocation.  Zielesch was convicted for conspiring to kill his wife's boyfriend and also for murdering the CHP officer.  On appeal, he sought reversal of the murder conviction on the ground the officer's shooting had not been in furtherance of the conspiracy and was, therefore, unforeseeable.

9

Citing *Kaufman* and other case law, *Zielesch* noted: "The law has been settled for more than a century that each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design. [Citations.]" (*People v. Zielesch, supra,* 179 Cal.App.4th at p. 739.) "The question whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable.' [Citation.] To be reasonably foreseeable ' " '[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough. . . .' [Citation.]" ' [Citation.] *Whether the unplanned act was a 'reasonably foreseeable consequence' of the conspiracy must be 'evaluated under all the factual circumstances of the individual case' and 'is a factual issue to be resolved by the jury'* [citation], whose determination is conclusive if supported by substantial evidence. [Citations.] [¶] Properly treating the issue as a question of fact, the trial court instructed the jury with CALCRIM No. 417." (*Id.* at pp. 739-740, fn. omitted.)[3] The bench note for CALCRIM No. 417 states: "Give this instruction when there is an issue whether the defendant is liable for the acts of coconspirators. (See *People v. Flores* (1992) 7 Cal.App.4th 1350, 1363 [no sua sponte duty when no issue of independent criminal act by coconspirator].)"

In the case at bar, the jury was never informed of this principle. However, the error was harmless because all of the trial evidence indicated the only motive for killing Youngblood was to eliminate a witness to Summerall's assassination, and that killing a potential witness was a natural and probable consequence of the conspiracy to kill Summerall. The forensic evidence indicated Youngblood had been killed execution-

---

[3]     *Zielesch* went on to hold there was substantial evidence to support the jury's conclusion the officer's murder had been foreseeable.

10

style; she was found lying in a crouched or kneeling position in a corner of the bedroom, and her only injury was a single gunshot wound which entered near the top of her head and had a downward trajectory toward the base of her skull. As discussed *ante*, the gang expert testified an innocent bystander such as Youngblood would likely be killed in order to eliminate a potential eyewitness.

Hence, we conclude the trial court's error in not giving CALCRIM No. 417 was harmless because it is "clear beyond a reasonable doubt that a rational jury would have found the defendant[s] guilty absent the error." (*Neder v. United States, supra,* 527 U.S. at p. 18.)

2. *The trial court erred, but not prejudicially, by failing to instruct the jury with CALCRIM No. 358 on viewing a defendant's extra-judicial statement with suspicion.*

Defendants contend the trial court erred by failing to instruct the jury, sua sponte, with CALCRIM No. 358 on viewing a defendant's extra-judicial statements with suspicion. Their focus is on whether the evidence showed they had asked B.B. and C.C. to act as lookouts on the night of the killings. Although the trial court erred by failing to give the instruction, we conclude the error was harmless.

a. *Legal principles.*

"It is well established that the trial court must instruct the jury on its own motion that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution. [Citations.] The purpose of the cautionary language in CALJIC No. 2.71 is to assist the jury in determining whether the defendant ever made the admissions. [Citations.] For this reason, the cautionary language is inapplicable to defendant's *recorded* admissions. [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 679.) "In requiring cautionary instructions . . . the courts of this state have not distinguished between actual admissions and damaging pre-offense statements of the accused relating to the crime. [Citations.]" (*People v. Lopez* (1975) 47 Cal.App.3d 8, 12.)

"In determining whether the failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.'

11

[Citations.] ' "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" ' [Citation.] This court has held to be harmless the erroneous omission of the cautionary language when, in the absence of such conflict, a defendant simply denies that he made the statements. [Citation.] Further, when the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, we have concluded the jury was adequately warned to view their testimony with caution. [Citation.]" (*People v. McKinnon, supra,* 52 Cal.4th at pp. 679-680.)

    b. *Discussion*.

    Burton points out there was conflicting evidence as to what he allegedly said to B.B. and C.C. before going into Summerall's apartment. At trial, B.B. testified Burton asked C.C. if he and B.B. "want[ed] to work." During his initial interview with Detective Rosa, B.B. said the question had been whether they wanted to make money. Later in the same interview, B.B. appeared to agree Burton had asked him and C.C. to be "lookouts," but B.B. subsequently distanced himself from that characterization and said they had only been asked "did we want to make some money." In a subsequent interview, B.B. explained that when the defendants asked if he and C.C. wanted "to do some work," he understood "work" to be a reference to selling drugs because "they used to tell us to do that for them a whole lot of times."

    Burton persuasively argues "[t]hese differences are significant. If Burton asked [B.B.] and[ C.C.] if they wanted to make money or sell drugs, that could be written off as having nothing to do with any conspiracy to shoot and kill Summerall. But if Burton asked them to be 'lookouts,' then that is strong evidence that he in fact was part of the alleged plan to murder Summerall. Therefore, there was a conflict in the evidence regarding what Burton said to [B.B.] and [C.C.] that probably had a material impact on

12

how the jury would view Burton's involvement in the shooting. It is for this very reason that the jury must be instructed to view Burton's out-of-court statements with caution."

Nevertheless, we conclude the trial court's error in failing to give the cautionary instruction was harmless. Burton's alibi defense effectively operated as a denial that he had said anything at all to B.B. Whatever conflict existed in the evidence, therefore, stemmed solely from B.B.'s somewhat inconsistent versions of what Burton said to him. And as to that, the Attorney General notes "the trial court instructed the jury with CALCRIM 226 on its responsibility to assess the credibility of witnesses, thus any inconsistency in [B.B.'s] testimony was necessarily resolved by the jury." The record shows the trial court told the jury it "must judge the credibility or believability of the witnesses" by considering such factors as "[h]ow well was the witness able to remember and describe what happened?", "what was the witness's behavior while testifying?" "[d]id the witness make a statement in the past that is consistent or inconsistent with his or her testimony?" The jury was also instructed: "Do not automatically reject testimony just because of inconsistencies or conflicts, consider whether the differences are important or not. People sometimes honestly forget things or make mistakes about what they remember."

In these circumstances, we conclude the trial court's error in failing to give the cautionary instruction was harmless. (See *Neder v. United States, supra,* 527 U.S. at p. 18.)

3. *Cumulative error.*

Defendants contend their convictions must be reversed for cumulative error. However, the two trial errors we have found were "clearly harmless. We therefore reject [the] claim of cumulative error." (*People v. Hinton* (2006) 37 Cal.4th 839, 897.)

4. *Improper multiple punishment under section 654.*

Defendants contend the trial court erred by not staying their sentences for the count 3 burglary convictions because, under section 654, it constituted improper multiple punishment. As the Attorney General concedes, this contention has merit.

13

Section 654, the prohibition against multiple punishment, provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them. [Citations.] 'We must "view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" ' " (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312-1313; *People v. McCoy* (1992) 9 Cal.App.4th 1578, 1585 [trial court's finding, whether explicit or implicit, may not be reversed if supported by substantial evidence].)

There is no doubt the defendants entered Summerall's apartment with the intent to commit murder, so there was necessarily an indivisible course of conduct. Indeed, the jurors had been instructed that, in order to find the defendants guilty of the burglary charged in count 3, they had to find the defendants entered a building with the intent to commit murder. (See *People v. Hester* (2000) 22 Cal.4th 290, 294 [where burglary perpetrated in order to commit assault, section 654 prohibited multiple sentencing]; *People v. McElrath* (1985) 175 Cal.App.3d 178, 191 [if factual basis for burglary conviction was entry with intent to commit sexual assault, then concurrent term for burglary conviction was barred by section 654].)

Defendants' sentences on count 3 must be stayed pursuant to section 654.

14

5. *Apparent sentencing error regarding count 3 and count 4.*

The defendants contend, and the Attorney General concedes, that the trial court's sentencing on count 3 and count 4 (burglary and robbery) was incorrect. As to both counts, the jury returned true findings pursuant to section 186.22, subdivision (b)(1)(C), of the street gang enhancement statute. But that section prescribes determinate 10-year terms, not the indeterminate life terms imposed by the trial court. We will remand to the trial court for resentencing on count 3 and count 4.

6. *Sentencing error regarding count 2.*

The defendants contend, and the Attorney General properly concedes, they were impermissibly sentenced to life without possibility of parole on both count 1 and count 2.

The trial court imposed life-without-possibility-of-parole terms on both count 1 (the first degree murder of Summerall) and count 2 (the second degree murder of Youngblood). However, section 190.2, subdivision (a)(3), only authorizes a multiple murder special circumstance finding for first degree murder, not second degree murder.[4] Hence, the trial court erroneously imposed life-without-possibility-of-parole terms for the second degree murder of Youngblood. On remand, the trial court shall correct this sentencing error.

---

[4] Section 190.2, subdivision (a) provides: "*The penalty for a defendant who is found guilty of murder in the first degree* is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (3) The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." (Italics added.)

## DISPOSITION

The judgments are affirmed in part, reversed in part, and remanded for resentencing. Defendants' convictions are affirmed. Defendants' sentences on count 3 must be stayed. Defendants' sentences on counts 2, 3 and 4 are stricken and the trial court is directed to resentence on those counts in accordance with this opinion. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation an amended abstract of judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

16