Filed 12/13/13  P. v. Quintana CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS BERNARDO QUINTANA,<br><br>    Defendant and Appellant. | B241783<br><br>(Los Angeles County<br>Super. Ct. No. BA 364009) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed with directions.

Slyvia Koryn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Along with two codefendants, appellant Luis Bernardo Quintana was charged with one count of murder after Julio Cesar Olivares was fatally shot while standing on the porch outside his house. Although appellant was present at the shooting, there was no evidence he was the shooter, so the prosecutor tried the case on the theories he was liable either as an aider and abettor to Olivares's murder or engaged in a conspiracy to assault Olivares, the natural and probable consequence of which was Olivares's murder. A jury found appellant guilty of the lesser included offense of voluntary manslaughter and found true an allegation that a principal was armed with a firearm.

Appellant challenges his conviction on several grounds: (1) the trial court erred in instructing the jury on aider and abettor liability; (2) the trial court should have instructed sua sponte on the lesser included offense of involuntary manslaughter; and (3) the trial court erred in allowing an amendment to the information after the jury reached its verdict and had been discharged. We reject these contentions and affirm appellant's conviction. There are, however, clerical errors in the verdict form, minutes of the sentencing hearing, and abstract of judgment, so we will direct the trial court to correct them.

## PROCEDURAL HISTORY

In an information filed July 27, 2010, appellant and codefendant Jose Quintana (Jose) were charged with one count of murder. (Pen. Code, § 187, subd. (a).)[1] It was alleged appellant personally used a firearm (§ 12022.53, subd. (b)), personally and intentionally used a firearm in the commission of the offense (§ 12022.53, subd. (c)), personally and intentionally used a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), and a principal was armed with a firearm (§ 12022, subd. (a)(1)). It was further alleged appellant had suffered a prior "strike" conviction. (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) At some point, a third codefendant Jessie Delgado was added.

The three codefendants were tried together before a jury. On the first day of trial, the court bifurcated the trial on appellant's prior strike conviction and appellant waived his right to a jury trial on it. After trial, the jury acquitted Delgado and convicted appellant and Jose

---

[1] All undesignated statutory references are to the Penal Code.

of the lesser included offense of voluntary manslaughter. (§ 192, subd. (a).) The jury found true the allegation that a principal was armed with a firearm as provided in section 12022, subdivision (a), although appellant's verdict form contains a clerical error, incorrectly citing section 12022.5, subdivision (a). Only appellant's conviction is at issue in this appeal.

After the jury had been discharged, but before appellant was sentenced, the prosecution sought to amend the information to allege appellant's prior strike conviction was also a serious felony pursuant to section 667, subdivision (a)(1). Over appellant's objection, the trial court granted the request.

At the sentencing hearing two months later, appellant admitted and the court found true the allegation he had suffered the prior conviction as both a serious felony (§ 667, subd. (a)(1)) and a strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Appellant was sentenced to 18 years in prison. Although the minutes from the sentencing hearing and the abstract of judgment contain clerical errors (discussed *post*), appellant was sentenced as follows: the midterm of six years for the voluntary manslaughter conviction, doubled to 12 years because of the prior strike; one year for the principal with a firearm allegation; and five years under section 667, subdivision (a)(1) for the prior serious felony. The court also imposed various fines, fees, and custody credits not at issue here. Appellant timely appealed.

### STATEMENT OF FACTS

#### 1. Prosecution Case

Silvia Lilly Melara lived with her husband, victim Julio Cesar Olivares, in Los Angeles.[2] The first time Melara saw appellant was in May 2009 when Melara and Olivares were in their truck by a fish market on the corner of 85th Street and Central Avenue. As they were about to make a left turn, Melara saw appellant walking toward their truck. He looked at Olivares in an angry way, like a "mad dog." Appellant and Olivares began to

---

[2]   They were not legally married but had been together for 19 years and had a son together.

argue and appellant told him, "I'll light you up, motherfucker." Melara yelled at Olivares not to fight, and they drove off.

Around 5:30 p.m. on July 9, 2009, the day of the shooting, Melara heard yelling outside her home. She looked out and saw appellant, codefendant Jose, and an unidentified African-American man standing on the sidewalk by her yard. The men shouted Oliveras's name. Jose asked Melara where was the "guy that drives a white truck?" Melara said the truck belonged to her and Olivares was not home. Appellant said, "Tell him to come out. Tell him to come outside." Appellant and Jose appeared angry and appellant said Olivares had crashed into their car. Melara told them again Olivares was not home, so the men told her they would be back in 15 minutes and drove off in a black truck. Oliveras arrived home five minutes later. Melara told him the men were looking for him and they would return in 15 minutes. Melara then left.

Eduardo Canela was Olivares's next-door neighbor, and on the day of the shooting, he was working on his truck in his front yard. He saw a black Tahoe or Yukon vehicle pass by three times, recognizing appellant as the driver. At one point appellant stopped while looking at Canela's house and asked Canela if the person with the white truck lived there, meaning Olivares. Appellant appeared upset. Canela told appellant no, he lived there with his wife and children. Appellant left and stopped to talk with individuals in a Camaro "[s]ome feet ahead" of Canela's house.

About 30 minutes later, a brown Suburban vehicle arrived at Canela's house and parked in his driveway. Appellant, Jose, and an unidentified African-American man exited the vehicle. Appellant and Jose approached Canela's house and knocked on the door several times. Canela was sitting in his truck at the time and gestured to them as if to say, "what are you looking for?" Appearing angry and upset, they came toward Canela. In Spanish,[3] appellant warned him not to cover up for "him," that is, Olivares. Jose warned Canela if he did, his house would be burned down along with anyone else inside. They tried

---

[3]    Canela's understanding of English is limited and he had a Spanish interpreter during the trial.

4

to open the doors to Canela's truck, and Canela became afraid and drove away "rapidly." He drove a few blocks, parked, and called Olivares, asking who were the men looking for him. After about 10 or 15 minutes, Canela returned home, went inside, and locked his doors.

A few minutes later, Canela heard arguing coming from Olivares's house. When he looked out his front door, he saw appellant, Jose, and two other people standing by the closed gate outside Olivares's house near the same Suburban from earlier. Two other people were in the car. Olivares stood a few feet away from appellant and Jose, separated by the gate. Although Canela did not understand English well, he heard Jose yell in English, "Leave my brother alone" and "I'm from Watts. This is my hood." After a few seconds, Canela quickly walked out his back door and over to Olivares's house to get a better view of what was happening. When he entered Olivares's back door to the kitchen, he heard several gunshots and crouched down. When the firing stopped, he went to the front door and found Olivares lying in the threshold, bleeding from gunshot wounds. Canela pulled him into the house.

At the same time, Olivares's cousin Toribio Olivares (Toribio) pulled up to Olivares's house. He heard two or three gunshots, so he ducked down and stopped his car. When Toribio raised his head, he saw the brown Suburban parked in front of Olivares's house. He saw appellant and Jose on the sidewalk facing the house. He also saw the door of the Suburban was open halfway and a passenger, Delgado, fire four or five shots out of the window toward the front door of Olivares's house. He saw another person in the driver's seat, but he could not see the person clearly. After the shooting, appellant and Jose ran from the scene in different directions and the Suburban drove away. Toribio ran into Olivares's house and helped Canela pull Olivares inside. Canela had called 911 by that time and handed Toribio the phone so he could speak to the operator in English.

Two Los Angeles police officers investigated the scene of the shooting. Because Olivares was expected to live at the time, the scene was investigated as an assault with a deadly weapon. Officers searched the surrounding residences for witnesses. They also interviewed Melara, Canela, and Toribio at the scene. A search uncovered two spent nine-

5

millimeter shell casings on the sidewalk outside the gate to Oliveras's house, one spent nine-millimeter shell casing at the gate, and a bullet fragment on Olivares's front porch. A police department criminalist concluded the casings came from two different firearms. No weapons or spent shell casings were found in the house or on the front porch.

Los Angeles Police Officer Gorgonio Medina interviewed witnesses as part of the ongoing investigation. Based on information gleaned from those interviews, he prepared a photographic six-pack lineup and showed it to the eyewitnesses, all of whom identified appellant and Jose. Officer Medina also located the black Yukon that had driven by Canela's house several times, which was registered to appellant. Officer Medina eventually arrested appellant and Jose and recovered keys from Jose belonging to a GMC vehicle, which turned out to be the Suburban from the incident. When Officer Medina asked Jose what the keys were for, Jose responded, "What the fuck? That's the car that you've been looking for, my truck. Let's get it over with." Officers located and impounded the Suburban. When they analyzed it, they located two bullet dents or impacts, but it was impossible to tell whether they happened during the incident or at some other time. There was also no way to determine whether the shots came from the direction of Olivares's house, although that could not be excluded as a possibility.

In January 2010, Olivares died from complications from his gunshot wounds. Prior to his death, he gave a conditional interview at the hospital, which was recorded and played for the jury.

## 2. *Defense Case*

None of the codefendants testified.

College student Veronica Cortes lived across the street and three houses down from Olivares. Around dinner time the day of the shooting, Cortes was sitting in her living room when she heard gunshots. She ran to her bedroom and looked out the window. She saw someone come from the right side of the Suburban, which was parked in the middle of the street, and run to the back of the vehicle and grab the luggage rack as the Suburban pulled away. She initially testified she did not see shots fired from the direction of the Suburban. However, on cross-examination she admitted she had seen the front passenger shoot at the

6

house, and then she claimed not to remember one way or the other.  She also stated the passenger was holding a black nine-millimeter firearm.

She also testified she saw an individual on the porch of Olivares's house shoot toward the Suburban and run into the house, and that she had told Officer Medina during an interview there was a man on the porch wearing a white shirt shooting at the Suburban.  She testified on cross-examination, however, she did not actually see anyone; she merely heard gunshots from that direction.

She saw four or five men leave the left side of the house and run away.  She did not see anyone on the sidewalk.  She saw one person exit the gate in front of Olivares's house and run northbound on Wadsworth Avenue.  The person was not carrying any objects in his hands.

Cortes never contacted law enforcement about what she had seen.  The defense learned she had witnessed the shooting because she had told her brother-in-law, who was friends with appellant.  She recalled appellant had been over to her house two times in the past, but did not recall seeing him the day of the shooting.

On July 13, 2009, Detective Teresa Hernandez was working phone duty at the 77th Police Division when a woman called identifying herself as Oliveras's wife.  She stated two male Hispanics had come to her house looking for Olivares, one of whom she had seen previously on the corner of Central Avenue and 85th Street.  The woman did not tell her the man told her husband, "I'm going to light you up, motherfucker."

## DISCUSSION

### 1. *Jury Instructions on Aider and Abettor Liability*

At trial, the prosecutor argued and the trial court instructed the jury on two theories of liability for appellant related to Olivares's death:  aider and abettor liability and conspiracy.  For the aider and abettor theory, the court instructed the jury with CALCRIM No. 400:  "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  [¶]  A person is guilty of a crime whether he or she committed it personally or aided and abetted the

7

perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

The court also read CALCRIM No. 401, which sets forth the requirements for aiding and abetting liability for the target crime, which in this case was murder: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant aided and abetted. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

For conspiracy, the court instructed the jury with CALCRIM No. 416, which set forth the requirements of proving an uncharged conspiracy to commit assault on Olivares; CALCRIM No. 915, which explained the elements of simple assault; and CALCRIM No. 417, which explained liability for coconspirators' acts, including the natural and probable consequences of the acts.

8

The court instructed on the elements of first and second degree murder, provocation, self-defense, and the lesser included offenses of voluntary manslaughter based on heat of passion and imperfect self-defense.

Appellant argues the trial court violated his due process and fair trial rights by not sua sponte amending CALCRIM No. 400 to also instruct the jury that an aider and abettor could be guilty of a lesser crime than the perpetrator or that each aider and abettor could be guilty of a lesser crime than the others. The Attorney General argues this argument was forfeited by the failure to object to the instruction in the trial court, and even if not forfeited, the argument fails on the merits and appellant suffered no prejudice from any possible error. We agree on all points.

"""[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.""" (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163 (*Samaniego*) [finding challenge to prior version of CALCRIM No. 400 forfeited for failing to raise it below]; see *People v. Mejia* (2012) 211 Cal.App.4th 586, 624 (*Mejia*) [same for similar CALJIC No. 3.00]; *People v. Loza* (2012) 207 Cal.App.4th 332, 350 (*Loza*); *People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118-1119 (*Lopez*); *People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 (*Canizalez*).) As discussed below, CALCRIM No. 400 was legally correct, so appellant has forfeited his argument that it was incomplete and misleading by not raising the contention below.

Notwithstanding forfeiture, appellant's claim fails on the merits. "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed." (§ 31.) In *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*), the court held an aider and abettor may be found guilty of a greater homicide-related offense than the actual perpetrator: "[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea. If [the aider and abettor's]

9

mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator." (*Id.* at p. 1122.)

Courts have relied on *McCoy* to reason an aider and abettor can be convicted of a *lesser* homicide-related offense than the actual perpetrator. (*Samaniego, supra*, 172 Cal.App.4th at pp. 1164-1165; see also *Mejia, supra,* 211 Cal.App.4th at p. 624; *Loza, supra*, 207 Cal.App.4th at pp. 351-352; *People v. Nero* (2010) 181 Cal.App.4th 504, 514.) In *Samaniego*, the jury was instructed with a previous version of CALCRIM No. 400, which read in pertinent part, "'A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.'" (*Samaniego, supra*, at p. 1163.) The court found the use of the phrase "equally guilty" to be misleading under the circumstances (but ultimately harmless) because the reasoning in *McCoy* "leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state." (*Id.* at p. 1164; see also *Nero, supra*, at pp. 518-519 [reaching same conclusion for similar CALJIC No. 3.00, but finding error prejudicial].) In short, "the extent of an aider and abettor's liability is dependent upon his particular mental state, which may, under the specific facts of any given case, be the same as, or greater or lesser than, that of the direct perpetrator." (*Mejia, supra*, at p. 624.)

CALCRIM No. 400 was revised in 2010 to eliminate the word "equally" (*Lopez, supra*, 198 Cal.App.4th at p. 1119, fn. 5; *Canizalez, supra*, 197 Cal.App.4th at p. 847, fn. 14), and the instruction in this case omitted it.[4] Appellant argues even this version of CALCRIM No. 400 directed the jury to find him equally guilty with the shooter[5] because

---

[4] In closing, the prosecutor argued the perpetrator and the aider and abettor are "equally on the hook" for the crime and a "person is equally guilty whether they committed the crime personally or aided and abetted the perpetrator committing it." Appellant has not asserted on appeal any claim of prosecutorial misconduct, which he in any case forfeited by not objecting in the trial court. (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

[5] Appellant contends Delgado was the shooter, even though he was acquitted and there was evidence of potentially two shooters.

10

the instruction did not also state that appellant could be convicted of a lesser offense than the perpetrators. However, as given to the jury, CALCRIM No. 400 correctly stated the general legal requirements for aiding and abetting liability, including that a "person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." CALCRIM No. 401 further instructed that the jury may find aider and abettor liability only when the aider and abettor "knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." And the trial court instructed the jury on the requirements of first and second degree murder and voluntary manslaughter.

We must consider the instructions as a whole, which the jury is presumed to follow, and must determine whether "there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." (*People v. Wilson* (2008) 44 Cal.4th 758, 803.) Nothing in these instructions created a reasonable likelihood the jury believed appellant had to be found "equally" guilty as the perpetrator as an aider and abettor.

Appellant further argues that CALCRIM No. 400 "allowed appellant to be found guilty of voluntary manslaughter based on his confederates' act of shooting at Olivares, and the jury was not required to make a finding that appellant intended more than to aid and abet the original assault." Further, with regard to the "natural and probable consequences doctrine, a juror in this case may have reasoned that appellant intended to aid and abet Jose Quintana and Jessie Delgado in the crime of committing an assault upon Julio Olivares and, given the circumstances, a reasonable person in appellant's position could have foreseen that the situation might escalate to the point where someone might kill Olivares."

These arguments conflate the prosecution's theories of liability in this case. As explained in *McCoy*, there are two kinds of aider and abettor liability. "First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'" (*McCoy, supra*, 25 Cal.4th at p. 1117.) The same is true for the theory of conspiracy. (*People v. Prettyman* (1996) 14 Cal.4th 248, 261

11

(*Prettyman*); *People v. Zielesch* (2009) 179 Cal.App.4th 731, 739 (*Zielesch*).)  Here, the jury was not instructed that appellant would be liable as an aider and abettor for the natural and probable consequences of an intended assault on Olivares.  (See, e.g., CALCRIM Nos. 402 and 403, which were not read to the jury.)[6]  The jury was instructed only as to aider and abettor liability for the intended crime of murder, which was set forth in CALCRIM No. 401.  The jury was instructed on the natural and probable consequences of an intended assault on Olivares as part of the *conspiracy* instructions, namely CALCRIM No. 417, which appellant has not challenged.  Thus, appellant's argument that the jury must have convicted him of *aiding and abetting* an assault on Olivares that led to Olivares's death as a natural and probable consequence is incorrect.[7]

Finally, appellant argues the jury could not have found him guilty of voluntary manslaughter under any theory, so it must have equated his guilt with that of the perpetrator without separately assessing his intent for aider and abetting liability, as required by *McCoy*. (*McCoy, supra*, 25 Cal.4th at p. 1121.)  A defendant is guilty of voluntary manslaughter "'when the defendant acts in a "sudden quarrel or heat of passion" [citation], or when the defendant kills in "unreasonable self-defense" -- the unreasonable but good faith belief in

---

**6**     In CALCRIM No. 400, the court instructed the jury, "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." As the bench notes to CALCRIM No. 400 explain, the court should not have included this paragraph because the prosecution did not argue and the court did not instruct on the natural and probable consequences theory for aiding and abetting liability.  (See Bench Notes to CALCRIM No. 400 (2013) pp. 155-156.)  Appellant does not challenge this passage on appeal and, in any case, the error was harmless for the reasons discussed, *post*.

**7**     Even if the jury had been instructed on the natural and probable consequences aiding and abetting theory, appellant's position is legally incorrect.  Under that theory, the jury needed only to find appellant harbored the mens rea to assist in assaulting Olivares and that his death was reasonably foreseeable; it did not need to find appellant harbored the separate mens rea to kill Olivares.  (*Canizalez, supra*, 197 Cal.App.4th at p. 852 ["Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime."].)

12

having to act in self-defense [citations].' [Citation.]" (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88; see also CALCRIM Nos. 570 & 571.) The jury was instructed on both theories.

Appellant correctly notes there was no evidence he was a shooter, so the jury could not have convicted him on the theory that he was directly responsible for Olivares's death. Appellant claims the jury could not have convicted him for aiding and abetting voluntary manslaughter because at the moment of the shooting he simply ran away from the scene, implying the shooter formed the intent to kill Olivares at that moment while under the heat of passion or in imperfect self-defense, and appellant did nothing to aid and abet the shooter after that point. Appellant also contends the jury could not have relied on a conspiracy theory because voluntary manslaughter based on heat of passion or imperfect self-defense cannot be planned as part of a conspiracy.

Appellant once again misunderstands the prosecution's theories of liability. Even if appellant is correct the jury could not have found him guilty of aiding and abetting voluntary manslaughter, the prosecutor argued and the trial court instructed the jury that if it found a conspiracy to assault Olivares, it could convict appellant of murder or manslaughter as a natural and probable consequence of that assault. The evidence overwhelmingly satisfied that theory. As a result, not only is appellant's argument incorrect that the jury could not have found him guilty of voluntary manslaughter under any theory, but for this reason any errors in the aiding and abetting instructions were harmless beyond a reasonable doubt. (*Samaniego, supra*, 172 Cal.App.4th at p. 1165 [applying *Chapman v. California* (1967) 386 U.S. 18, 24].)

In order to find a conspiracy to commit assault, the jury was instructed pursuant to CALCRIM No. 416 that it must find, among other elements, that appellant intended to agree and did agree with another member of the conspiracy to assault Olivares, intended he or another member of the conspiracy would in fact assault Olivares, and undertook at least one of the following enumerated overt acts in furtherance of the conspiracy: drove around the block looking for Olivares; approached Canela asking about Olivares and threatening Canela; approached Olivares's home looking for him; armed themselves; entered the Suburban; drove to Olivares's house; exited the vehicle; and confronted Olivares.

13

To convict appellant of the nontarget crime of voluntary manslaughter, the jury was instructed pursuant to CALCRIM No. 417 that "[a] member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy." A natural and probable consequence was defined for the jury as "one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." The jury was therefore required to find "1. The defendant conspired to commit one of the following crimes: an assault on Julio Cesar Olivares; [¶] 2. A member of the conspiracy committed murder or manslaughter to further the conspiracy; [¶] AND [¶] 3. The murder or manslaughter was a natural and probable consequence[] of the common plan or design of the crime that the defendant conspired to commit."

The evidence demonstrated that approximately two months before the shooting, appellant and Olivares had a confrontation, during which appellant looked angry and threatened Olivares, "I'll light you up, motherfucker." On the day of the shooting, appellant, Jose, and a third man showed up outside Olivares's house, asking for Olivares and appearing angry. Olivares's neighbor Canela saw appellant drive by several times, and eventually appellant stopped and asked Canela if Olivares lived at his house, again appearing upset. Later, appellant, Jose, and a third man returned to Canela's house, still angry and upset, and Jose threatened Canela not to cover up for Olivares or he would burn down his house and everyone inside. Appellant then showed up at Olivares's house with five other men, at least one (and potentially two) of whom were armed. He, Jose, and two men argued with Olivares, and then someone opened fire and shot Olivares, which eventually killed him. Appellant fled from the scene.

This evidence supported the jury's finding of a conspiracy to commit assault on Olivares and that a reasonable person in appellant's position would have known his coconspirators would shoot Olivares during the confrontation. (*Zielesch, supra*, 179 Cal.App.4th at p. 739 ["The question whether an unplanned crime is a natural and probable

14

consequence of a conspiracy to commit the intended crime 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable.' [Citation.] To be reasonably foreseeable[,] "'"[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . .' [Citation.]"' [Citation.]"].)

Further, to support a voluntary manslaughter conviction, there was evidence Olivares shot at appellant and his coconspirators, provoking them to shoot back intending to kill or with conscious disregard for life, but either out of a heat of passion or in imperfect self-defense, which would negate the malice required for murder. (*People v. Bryant* (2013) 56 Cal.4th 959, 968 (*Bryant*) [like murder, voluntary manslaughter requires either an intent to kill or conscious disregard for life, but with the element of malice negated by provocation or unreasonable self-defense]; *People v. Rios* (2000) 23 Cal.4th 450, 460-461.) The jury was entitled to credit this evidence and find the prosecution failed to carry its burden to prove a *lack* of heat of passion or imperfect self-defense beyond a reasonable doubt. (*Rios, supra*, at p. 462 ["If the issue of provocation or imperfect self-defense is thus 'properly presented' in a murder case [citation], the *People* must prove *beyond a reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice. [Citations.] . . . [Citation.] In such cases, if the fact finder determines the killing was intentional and unlawful, but is not persuaded beyond reasonable doubt that provocation (or imperfect self-defense) was absent, it should acquit the defendant of murder and convict him of voluntary manslaughter. [Citations.]"].)[8]

The jury was therefore justified in convicting appellant of voluntary manslaughter as a natural and probable consequence of the conspiracy to commit an intended assault on Olivares, so any error in the aiding and abetting instructions was harmless beyond a reasonable doubt.

---

[8] As part of the voluntary manslaughter instructions, the jury was instructed the People have the burden to prove a lack of heat of passion and imperfect self-defense beyond a reasonable doubt, and if that burden is not met, appellant must be found not guilty of murder.

15

## 2. *Sua Sponte Involuntary Manslaughter Instruction*

Appellant argues the trial court violated his due process and fair trial rights by not instructing sua sponte on involuntary manslaughter, which is a lesser included offense to murder. (*Prettyman, supra*, 14 Cal.4th at p. 274.) "A trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414, fn. omitted.) "Substantial evidence in this context is that which a reasonable jury could find persuasive." (*Ibid.*; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

We need not decide whether the trial court erred because appellant suffered no prejudice. "[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836]. A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman, supra*, 19 Cal.4th at p. 178.)

As discussed above, two months prior to the shooting, appellant confronted and threatened Olivares, and on the day of the shooting, drove by Olivares's house multiple times and, with his coconspirators, confronted Olivares's wife once and Canela twice. During the second encounter with Canela, appellant's coconspirator Jose threatened to burn down Canela's house with everyone inside if he was covering up for Olivares. Appellant then showed up at Olivares's house with several others, some armed, and one or more of them shot multiple rounds at Olivares, fatally wounding him. This deliberate escalation of the conflict between appellant and his conspirators with Olivares, culminating in the armed confrontation in front of his house during which Olivares was fatally shot demonstrates at least voluntary manslaughter. (*People v. Woods* (1992) 8 Cal.App.4th 1570, 1593 ["[T]he trial court need not instruct on a particular necessarily included offense if the evidence is

16

such that the aider and abettor, if guilty at all, is guilty of something beyond that lesser offense, i.e., if the evidence establishes that a greater offense was a reasonably foreseeable consequence of the criminal act originally contemplated, and no evidence suggests otherwise."].)  Under these facts, it was not reasonably probable the jury would have convicted appellant of involuntary manslaughter if the trial court had given that instruction, so any error in failing to do so was harmless.

### 3. *Belated Amendment to the Information*

After the jury reached its verdict and was discharged, the trial court allowed the prosecution to amend the information to include an allegation that appellant's prior strike conviction also constituted a serious felony pursuant to section 667, subdivision (a)(1). Appellant argues the trial court erred in allowing this belated amendment.  We disagree.

The original information alleged appellant had suffered a prior conviction for violating section 246, which constituted a prior strike conviction pursuant to section 667, subdivisions (b) through (i) and section 1170.12, subdivisions (a) through (d).  On the first day of trial, appellant moved to bifurcate the trial of the prior strike from the trial of the merits, which the trial court granted.  At that time, the trial court also took a waiver of appellant's right to have a jury determine whether the prior strike was true, explaining appellant would otherwise be entitled to have the same jury that decided his guilt decide the strike prior.[9]  After the jury returned its guilty verdict for appellant and his codefendant, it was discharged and the trial court continued the matter a week for sentencing.

At the next hearing, sentencing was again continued and the prosecutor for the first time sought to amend the information to add an allegation that appellant's prior strike conviction also constituted a serious prior felony subject to a five-year enhancement under

---

[9]     The transcript of the waiver incorrectly states appellant's prior conviction was for a violation of section 245, not section 246.  During trial outside the presence of the jury, the court explained the prior conviction was for a violation of section 246 for shooting at a residence.  Appellant argues without citation to authority the mistake rendered the waiver invalid.  We disagree.

section 667, subdivision (a)(1).[10]  When asked, the prosecutor had no explanation why it was not added previously.  Appellant objected to the amendment.  The trial court expressed reservations that it would have to impanel a new jury, but the prosecutor noted the underlying conviction was the same as that alleged for the prior strike and appellant had waived a jury as to that conviction.  The trial court noted the trial on the prior strike had not yet occurred, so the court allowed the amendment because "the People are entitled to amend anytime up to the verdict on that allegation."  After continuing the matter for two months, the court held the sentencing hearing, during which the appellant admitted and the court found true his prior conviction.

Section 1025 provides in pertinent part:  "(b)  Except as provided in subdivision (c), the question of whether or not the defendant has suffered the prior conviction shall be tried by the jury that tries the issue upon the plea of not guilty, or in the case of a plea of guilty or nolo contendere, by a jury impaneled for that purpose, or by the court if a jury is waived. [¶]  (c)  Notwithstanding the provisions of subdivision (b), the question of whether the defendant is the person who has suffered the prior conviction shall be tried by the court without a jury."[11]  In short, section 1025 provides a limited right to a jury trial on prior convictions, including a right to have the conviction tried before the same jury that decided guilt.  (*People v. Epps* (2001) 25 Cal.4th 19, 23 (*Epps*); *People v. Tindall* (2000) 24 Cal.4th 767, 771-772 (*Tindall*).)

Appellant relies on *Tindall* to argue the trial court's allowance of the amendment after discharging the jury deprived him of his right to have the same jury decide whether his prior conviction satisfied section 667, subdivision (a).  Before the Supreme Court decided

---

**10**     The prosecutor also sought to add an allegation under the Criminal Justice Realignment Act of 2011, section 1170, subdivision (h).  That amendment is not at issue here.

**11**     Section 1158 similarly states in pertinent part, "Whenever the fact of a previous conviction of another offense is charged in an accusatory pleading, and the defendant is found guilty of the offense with which he is charged, the jury, or the judge if a jury trial is waived, must unless the answer of the defendant admits such previous conviction, find whether or not he has suffered such previous conviction."

18

*Tindall*, it decided *People v. Valladoli* (1996) 13 Cal.4th 590, which addressed whether section 969a[12] permitted the prosecution to amend the information to add prior conviction allegations after the jury has rendered its verdict but before it has been discharged. (*Valladoli*, at p. 594.)  It answered affirmatively and set out a list of factors trial courts may consider in determining whether to allow the amendment.  (*Id.* at pp. 607-608.)  It expressly declined to address the situation in which "the People attempted to amend the information or indictment after the jury was discharged" and "express[ed] no opinion on whether such amendments are permissible under *other* statutory provisions," citing, inter alia, section 1025.  (*Valladoli*, at p. 608, fn. 4.)  *Tindall* addressed that question and held section 1025 precludes the prosecutor from adding prior conviction allegations to the information once the jury that decided guilt has been discharged.  (*Tindall, supra*, 24 Cal.4th at pp. 769-770; see also *People v. Gutierrez* (2001) 93 Cal.App.4th 15, 23-24.)  Neither *Valladoli* nor *Tindall* addressed the precise scenario in this case, however, because neither case involved an amendment alleging only the legal effect of a *previously alleged* prior conviction. (*Tindall, supra*, at pp. 770-771; *Valladoli, supra*, at pp. 595-596.)

The right to a jury trial on prior convictions embodied in section 1025 extends only to having the jury "'determine . . . whether [the defendant] "suffered" the alleged prior conviction'" (*Epps, supra*, 25 Cal.4th at p. 23, quoting *People v. Wiley* (1995) 9 Cal.4th 580, 589 (*Wiley*)), not the legal effect of that conviction, such as whether the prior conviction constituted a strike (*People v. Kelii* (1999) 21 Cal.4th 452, 455-456) or whether the prior conviction is subject to the five-year enhancement in section 667, subdivision (a) (*People v. Williams* (2002) 99 Cal.App.4th 696, 701).  Here, appellant waived his right to a jury trial on whether he suffered the prior conviction, albeit with the understanding it would

---

**12**     Section 969a states, "Whenever it shall be discovered that a pending indictment or information does not charge all prior felonies of which the defendant has been convicted either in this State or elsewhere, said indictment or information may be forthwith amended to charge such prior conviction or convictions, and if such amendment is made it shall be made upon order of the court, and no action of the grand jury (in the case of an indictment) shall be necessary.  Defendant shall promptly be rearraigned on such information or indictment as amended and be required to plead thereto."

constitute a strike conviction, not that it would also subject him to a five-year enhancement under section 667, subdivision (a). But because he had a right under section 1025 only to a jury deciding whether he suffered the prior conviction, not its legal effect, and he waived that right, the trial court could not have violated section 1025 in allowing the belated amendment pertaining only to the legal effect of the prior conviction.

The remaining question is whether the trial court abused its discretion in allowing the belated amendment under section 969a in light of the factors set forth in *Valladoli*. While not exhaustive, those factors include "(i) the reason for the late amendment, (ii) whether the defendant is surprised by the belated attempt to amend, (iii) whether the prosecution's initial failure to allege the prior convictions affected the defendant's decisions during plea bargaining, if any, (iv) whether other prior felony convictions had been charged originally, and (v) whether the jury has already been discharged [citation]." (*Valladoli, supra*, 13 Cal.4th at pp. 607-608.)

The trial court did not expressly weigh these factors, but our review of them supports the trial court's allowance of the amendment. The first factor was at most neutral because, while the prosecutor offered no explanation for the omission, there was nothing to suggest the omission was intentional. (*Valladoli, supra*, 13 Cal.4th at p. 608.) The second and fourth factors weigh in favor of allowing the amendment. Appellant could not have been taken entirely by surprise because his prior conviction had already been alleged and the trial court took a waiver of his jury trial right on that conviction before trial began. (*Ibid.*) Moreover, the sentencing hearing was continued two months after the court granted the request to amend, so appellant had plenty of time to research and respond to the new allegations (although he ultimately admitted the prior conviction). The third and fifth factors are neutral because nothing in the record sheds light on the plea bargaining process and, as we concluded *ante*, appellant did not have the right to a jury trial on the amended

20

allegation, so whether the jury was discharged is immaterial. On balance, the trial court did not abuse its discretion to allow the late amendment.[13]

## 4. Error in Verdict Form

Both the abstract of judgment and the sentencing minute order reflect the jury found true the allegation that a principal was armed with a firearm pursuant to section 12022, subdivision (a). However, the verdict form contains a clerical error, incorrectly citing section 12022.5, subdivision (a) for the enhancement the jury found true, although the form correctly described the allegation as "a principal was armed with a firearm, specifically: a handgun . . . ." The Attorney General concedes the error and we agree. The amended information charged, the prosecutor argued, and the trial court instructed on the principal armed with a firearm enhancement in section 12022, subdivision (a), not section 12022.5, subdivision (a), so the citation of that section in the verdict form was unquestionably a clerical error. (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1273.) We therefore direct the trial court to correct the verdict form to reflect the correct citation of section 12022, subdivision (a).

## 5. Errors in Minutes of the Sentencing Hearing and Abstract of Judgment

Appellant was sentenced to a total term of imprisonment of 18 years. In the transcript of the sentencing hearing, the trial court sentenced appellant "to the mid-term of 12 years in state prison for the allegations that a principal is armed pursuant to Penal Code section 12022(a). I sentence an additional consecutive term of one year for the fact that you were previously convicted of a serious felony. I impose an additional consecutive term of five years for a total aggregate term of 18 years in any state prison." We presume the court

---

[13] Appellant argues the belated amendment violated his due process right to notice of the charges and allegations against him. The court in *Valladoli* rejected the same argument, holding a postverdict, presentencing amendment under section 969a does not violate due process because the defendant may obtain a continuance, the omission in the case was not intentional, and the defendant was not surprised by the amendment. (*Valladoli, supra*, 13 Cal.4th at pp. 607-608.) The same is true in this case -- there was no suggestion the omission was intentional, appellant was not unduly surprised by the amendment, and after the amendment, appellant's sentencing was continued two months.

21

misspoke because the 12-year term must have been the midterm of six years for voluntary manslaughter (§ 193, subd. (a)), doubled to 12 years in light of the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)); the additional one year must have been for the principal firearm use allegation (§ 12022, subd. (a)); and the additional five years must have been for the prior serious felony (§ 667, subd. (a)(1)).[14] The parties agree with our interpretation.

With that understanding, neither the minutes from the sentencing hearing nor the abstract of judgment correctly transcribed appellant's sentence. The minutes of appellant's sentencing on May 23, 2012, indicate appellant would "[s]erve 18 years in any state prison[.] [¶] Court selects the upper term of 12 years as to the base term count 01. [¶] Plus 6 years pursuant to section see comments[.]" This was incorrect because the 12 years was not the upper term, but the midterm doubled for the prior strike. In another part, the minutes repeat this error: "As to count 1, a violation of Penal Code section 192(a), defendant is to be imprisoned in any state prison for a total aggregate term of 18 years. The court selects the high term of 12 years as the base term as to this count, plus an additional term of 1 year pursuant to Penal Code section 12022(a), plus an additional term of 5 years pursuant to Penal Code section 667(a)."

The abstract of judgment repeated the incorrect statement that the court imposed the upper term for count 1. The abstract of judgment also did not reflect appellant's sentence was a "two-strike" sentence pursuant to section 667, subdivisions (b) through (i) or section 1170.12 by checking the appropriate box under No. 4.

We must order the trial court to correct clerical errors in the sentencing minutes and abstract of judgment to conform with the oral pronouncement of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [abstract of judgment]; *People v. Zackery* (2007) 147 Cal.App.4th 380, 385 [sentencing minutes].) The trial court is therefore directed to prepare amended minutes for the May 23, 2012 sentencing hearing to correct all references to the

---

**14** We believe the court simply misspoke because appellant's codefendant was given the same sentence without the prior strike and serious felony enhancements: six years in state prison for the voluntary manslaughter conviction, plus one year for the principal armed with a firearm enhancement.

upper or high term to reflect the midterm for count 1.  The trial court is directed to issue an amended abstract of judgment to correct all references to the upper or high term to reflect the midterm for count 1 and to check the appropriate box under No. 4 that appellant's sentence was a "two-strike" sentence.

## DISPOSITION

The judgment is affirmed.  Consistent with our discussion *ante*, we direct the trial court to correct the clerical error in the verdict form, issue amended minutes for the sentencing hearing, issue an amended abstract of judgment, and forward a copy of the amended abstract of judgment to the Department of Corrections.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

23