Filed 9/23/20  P. v. Montgomery CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B297127 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457021) |
| v. | |
| MONDRAY MONTGOMERY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lisa B. Lench, Judge.  Affirmed.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Mondray Montgomery was convicted of eight felonies and two misdemeanors by a jury for his part in a home invasion robbery. On appeal, he contends the trial court committed instructional error and improperly denied his motion for new trial. We affirm the judgment.

## FACTS

On May 30, 2014, 80-year-old Samuel Hirt and 73-year-old Diana Hirt[1] had just completed a prayer service at their Beverly Hills home when they heard a soft knock at the door. Believing someone had forgotten something, Samuel opened the door without asking who it was. Three men rushed in, threw Samuel down, and caused him to hit his head on the marble floor. The men had hoods covering their heads; Diana described the hoods as pillowcases with holes cut out for the eyes. They also wore shirts with the word "Security" on them.

The men demanded money and access to the Hirts' safe. They threatened to shoot Samuel in the head. Both Samuel's and Diana's hands and feet were tied with plastic zip ties. Samuel was punched in the face and severely beaten by two of the three men. Diana was shot in the leg by the third man. Diana said she did not keep money in the house but offered them her jewelry. Diana was dragged by her feet to her bedroom closet, where she kept the key to the safe. Diana had just taken off her two-carat diamond engagement ring and left it on top of the bureau in her closet. She was then dragged to Samuel's office, where they unlocked the safe, took everything in it, and ran out. Diana

---

[1]     For ease of reference, we refer to the Hirts by their first names.

reported they took all her jewelry. Shortly after they left, Samuel was able to untie himself and free Diana.

Nearby surveillance video from the night of the robbery captured a man riding a motorcycle past the Hirts' home several times from approximately 8:12 p.m. to 8:25 p.m. The man twice stopped near the Hirts' home. The Hirts called 911 at 8:30 p.m.

During the investigation, the Beverly Hills Police Department (BHPD) received information from the Los Angeles Police Department (LAPD) about two potential suspects in the Hirt robbery—Denzel Washington and Wasani Davis. When BHPD detectives interviewed Davis, he admitted he committed a string of residential burglaries in May and June of 2014 with Washington, Washington's girlfriend, Mia Green, and Sidney Wilson.[2] Davis said he did not know Montgomery.

Davis was a member of the Rollin 20 Outlaws, a gang affiliated with the Bloods. He was introduced to Washington between March and May of 2014 by a mutual friend, who was also a gang member and vouched for Washington as someone with whom Davis could commit crimes. During this time, Davis wore an ankle bracelet from a bail bond company that tracked his movements.

On May 30, 2014, Washington, Green, and Wilson asked Davis to participate in a home invasion robbery. Washington told Davis he planned to target Jewish and Asian households in Beverly Hills, Malibu, and Pacific Palisades. He said the crew

---

[2]     Because Davis, Washington, Wilson, and Green are not parties to this appeal, we need not recount the facts surrounding the other residential burglaries or the crimes with which they were charged.

3

would be dressed in mechanic's outfits or jumpsuits and bring cigarettes to burn people. Davis declined because he was in a wheelchair at the time, having hurt his foot in a fight. Additionally, he was too tired because he had been awake and on drugs for several days. Davis's ankle bracelet showed he was not in Beverly Hills at the time of the Hirt robbery.

Towards the middle of June 2014, Wilson offered to sell a .38 revolver to Davis for $250. Davis thought the price was too high and passed on the offer. Wilson told Davis that Washington used the gun in a robbery they committed while dressed up in uniforms.

Davis described how he, Washington, Wilson, and Green drove around Los Angeles in a white Dodge Charger, "scoping" potential homes to burglarize. They committed burglaries in Beverly Hills and West Los Angeles on June 16 and June 18, using pepper spray and a glass breaking device. After the last burglary, Davis and the crew drove to a garage on 39th Street where there were police scanners and tools and equipment to open safes.

During a search of the garage, BHPD found a motorcycle parked between the front door and the garage that matched the one depicted on the surveillance video. They also recovered motorcycle boots, a helmet, gloves, and jackets that appeared to be like those worn by the man on the motorcycle. At least two police scanners, three weapons, ammunition, hundreds of miscellaneous items of jewelry, and various financial documents were found in the garage.

In November 2015, Wenisha Stewart called BHPD with information regarding Montgomery's role in the Hirt robbery. Stewart had known Montgomery for over 20 years as her

4

mother's husband.  Stewart was angry at Montgomery because he caused her mother, with whom she and her daughter had been living, to be evicted from their apartment.  Montgomery also caused Stewart's car to be impounded.

Stewart reported a friend told her Montgomery was trying to sell a "really big" ring that he had stolen.  Montgomery told Stewart's friend and another individual that the woman refused to give up her ring, so he shot her in the leg.  When Stewart confronted Montgomery, he confessed he participated in a robbery in Beverly Hills with Washington, Washington's girlfriend, and a man on a motorcycle.  Montgomery admitted he shot a woman and took a ring from her.  Montgomery described how they ransacked the large one-story house after the woman was shot and how her husband "went crazy."  He also told Stewart they left a car at the location the night before the robbery.  Stewart knew Montgomery owned a black revolver.

At trial, Stewart testified she did not recall any of her interview with BHPD.  An investigator for the prosecutor's office testified Stewart refused to accept service of the subpoena to testify at trial because she had been "jumped and beat up" by several people who called her a "snitch".  Stewart's interview with BHPD was recorded and played to the jury.  A transcript of it was also admitted into evidence.

To discredit her, defense counsel for the codefendants presented evidence of Stewart's extensive criminal history and testimony that she had a reputation for dishonesty in the community.  They argued Stewart had a motive to lie about Montgomery due to her personal issues with him.  Further, they claimed she lied about Diana refusing to give up her ring, as Diana had testified she had taken off the ring and placed it on

5

top of the bureau in her closet and that no one demanded the ring from her.

Using Davis's and other phone records, BHPD traced the cell phone numbers of Montgomery, Washington, and Wilson. The records revealed that the night before the Hirt robbery, over 60 phone calls were exchanged between Washington and Montgomery's cell phones. Additionally, the records revealed Montgomery's cell phone used cell towers in Beverly Hills the evening before the Hirt robbery, indicating he was in the area. On May 30, 2014, between 8:07 p.m. to 8:11 p.m., Montgomery and Washington made several calls using cell towers located near the Hirts' residence.

Montgomery, Washington, Wilson, and Green were initially charged with 41 counts in connection with the Hirt robbery and several other residential burglaries. In a second amended information, Montgomery was charged with attempted murder (Pen. Code, §§ 664/187, subd. (a); count 1)[3], aggravated mayhem (§ 205; count 2), torture (§ 206; counts 3–4), home invasion robbery (§ 211, counts 5–6), first degree residential burglary (§ 459; count 7), assault with a firearm (§ 245, subd. (a)(2); counts 8–9), conspiracy to commit residential burglary (§ 182, subd. (a)(1); count 10), kidnapping for ransom (§ 209, subd. (a); count 21),[4] possession of firearm by a felon (§ 29800, subd. (a)(1); count 39), and conspiracy to commit home invasion robbery (§ 182, subd. (a)(1); count 41). As to every count except count 39, it was

---

[3]     All further section references are to the Penal Code unless otherwise specified.

[4]     The trial court granted Montgomery's motion for judgment of acquittal as to count 21 pursuant to section 1118.1.

alleged he personally used a firearm (§ 12022.5), and that a principal personally and intentionally discharged a firearm. (§ 12022.53, subds. (b)–(e).) A gang enhancement was also alleged as to all counts. (§ 186.22, subd. (b)(1).)

The jury found Montgomery guilty of counts 3 through 8, 10, and 41, and not guilty on counts 1, 2, 9, and 39. As to counts 2 and 9, the jury found him guilty of the lesser included offense of misdemeanor assault (§ 240). The jury also found true the allegation that a principal used a firearm as to counts 3, 5 through 8, and 41, but found not true the allegations that Montgomery personally used a firearm. The gang enhancement allegations were found not true.

The trial court sentenced Montgomery to a determinate term of eight years plus an indeterminate term of life in prison with a minimum parole eligibility of seven years. He timely appealed.

## DISCUSSION

### I. Jury Instruction Issues

Montgomery asserts the trial court erred when it instructed the jury regarding accomplice testimony and torture as a natural and probable consequence of conspiracy to commit residential burglary. Montgomery also contends the trial court erred when it failed to instruct the jury regarding assault by means of force likely to commit great bodily injury and felony battery as lesser included offenses of torture.

The People contend Montgomery has forfeited these issues by failing to raise them below. Montgomery acknowledges he did not object to the challenged instructions at trial. " 'Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in

7

the trial court.' [Citation.]" (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132.)

Montgomery, however, argues these issues are cognizable because they affect his substantial rights. (§ 1259.) California courts have equated "substantial rights" with reversible error under the test stated in *People v. Watson* (1956) 46 Cal.2d 818. (*People v. Lawrence* (2009) 177 Cal.App.4th 547, 553, fn. 11; *People v. Felix* (2008) 160 Cal.App.4th 849, 857.) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim. . . ." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.) As a result, we address Montgomery's contentions on the merits to determine whether any instructional error affected his substantial rights.

### A. Standard of Review

"We review a claim of instructional error de novo. [Citation.] The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.) We presume the jurors were able to understand and correlate all the instructions given. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) When instructions are claimed to be conflicting or ambiguous, "we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.) If reasonably possible, instructions are interpreted to support the judgment rather than defeat it. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)

## B. The Court Properly Instructed the Jury on Accomplice Testimony

Montgomery asserts the trial court misled the jury to believe all of Davis's testimony required corroboration when it was required only for his accomplice testimony. He also faults the prosecutor for compounding the problem because, during his closing argument, he described Stewart as someone who was not an accomplice and whose testimony did not require corroboration yet described Davis as an accomplice who did require corroboration. Montgomery's argument is baseless because the trial court specified that only the portion of Davis's testimony regarding the residential burglaries required corroboration.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "Exculpatory testimony, by definition, cannot be said to support a conviction and, thus, need *not* be corroborated." (*People v. Smith* (2017) 12 Cal.App.5th 766, 780 (*Smith*).)

At trial, Davis provided exculpatory testimony as to Montgomery; he testified Wilson attempted to sell him a gun matching the description of the one used in the Hirt robbery and told him Washington, not Montgomery, used it to shoot someone during a home invasion. Indeed, Davis stated he did not know Montgomery. However, Davis also provided inculpatory testimony regarding the other residential burglaries in which he was an accomplice. Davis's exculpatory testimony did not require

corroboration, but his inculpatory accomplice testimony did. (*Smith, supra,* 12 Cal.App.5th at p. 781.)

The court properly instructed the jury with CALCRIM No. 335, which provided, in part: "If the crime of residential burglary was committed, as charged in Count Eleven, Twelve and/or Thirteen, then Wasani Davis was an accomplice to that crime." The trial court then went on to instruct the jury it could use the statement or testimony of an accomplice to convict the defendant only if the accomplice's statement or testimony was supported by independent evidence that tended to connect the defendant to the commission of the crime. Further, the court instructed that accomplice testimony "that tends to incriminate the defendant" should be viewed with caution.

Montgomery acknowledges he was not charged in counts 11 through 13. Those counts relate to the residential burglaries in which Montgomery did not participate. Given that the court instructed the jury that corroboration was needed only for those counts with which Montgomery was not charged, it is not reasonably likely the jury applied the instruction in an impermissible manner. The trial court did not err when it instructed the jury as to Davis's accomplice testimony.

Moreover, the prosecutor's closing statements do not impact our analysis. "The court's instructions, not the prosecution's argument, are determinative, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate to persuade.' [Citation.]" (*People v. Mayfield* (1993) 5 Cal.4th 142, 179.)

## C. The Trial Court Correctly Instructed the Jury Torture Is a Natural and Probable Consequence of Conspiracy to Commit Residential Burglary

Montgomery next argues the trial court erred when it instructed the jury that it could find him guilty of the torture of Diana and Samuel if it found torture was a natural and probable consequence of conspiracy to commit residential burglary. Montgomery takes issue with CALCRIM No. 417, which advised the jury that attempted murder, aggravated mayhem, torture, or assault with a firearm were natural and probable consequences of conspiracy to commit residential burglary or home invasion robbery.[5]  According to Montgomery, torture may never be a natural and probable consequence of a conspiracy to commit residential burglary and it is therefore a legally incorrect theory on which to base his conviction for torture.

We disagree and conclude torture is a reasonably foreseeable consequence of an armed residential burglary such as the one that occurred at the Hirt residence.  As a result, the alternate theories of culpability for torture, whether under a direct perpetrator theory or under a natural and probable consequences theory, were both legally correct and no error resulted.

1. *Proceedings Below*

The trial court instructed the jury that Montgomery could be found guilty of conspiracy as either a direct perpetrator or as a coconspirator under a natural and probable consequences theory.

---

[5]     Montgomery does not dispute that torture may be a natural and probable consequence of a conspiracy to commit home invasion robbery.

11

The trial court instructed the jury with CALCRIM No. 417 as follows:

"A member of a conspiracy is criminally responsible for the crimes that he . . . conspires to commit, no matter which member of the conspiracy commits the crime.  [¶]  A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy.  This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.  [¶]  A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

"To prove that a defendant is guilty of the crimes charged in Counts One, Two, Three, Four, Eight and Nine, as a coconspirator, the People must prove that:  [¶]  1. The defendant conspired to commit . . . Residential Burglary (as to Count Ten) and/or Home Invasion Robbery (as to Count Forty-One);  [¶]  2. A member of the conspiracy committed Attempted Murder, Aggravated Mayhem, Torture, or Assault with a Firearm to further the conspiracy;  [¶]  AND  [¶]  3. Attempted murder, aggravated mayhem, torture, or assault with a firearm were

12

natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit."

*2. Applicable Law*

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground.  [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 167.)

A defendant may be guilty of a crime as the direct perpetrator of the crime or as a coconspirator.  (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 851.)  "The law has been settled for more than a century that each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design.  [Citations.]  [¶] . . . [¶]  The question whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable.'  [Citation.]  To be reasonably foreseeable ' " '[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . '  [Citation.]" '  [Citation.]  Whether the unplanned act was a 'reasonably foreseeable consequence' of the conspiracy must be 'evaluated under all the factual circumstances of the individual case' and 'is a factual issue to be resolved by the jury' [citation], whose determination is conclusive if supported by

13

substantial evidence.  [Citations.]" (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739–740.)

   *3.  Analysis*

   Montgomery contends torture, as a matter of law, may never be a natural and probable consequence of a conspiracy to commit residential burglary.  According to Montgomery, his convictions for torture must therefore be reversed because we cannot determine under which theory the jury found him guilty of the torture of Diana and Samuel—as a direct perpetrator or as part of a conspiracy to commit residential burglary or home invasion robbery.

   Montgomery fails to provide any authority to support his contention.  The cases on which he relies address the relationship between target and unplanned crimes that are different from the ones in this case.  (*People v. Leon* (2008) 161 Cal.App.4th 149, 161 [witness intimidation was not the natural and probable consequence of vehicle burglary or illegal possession of a weapon]; *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1355 [first degree murder was not a natural and probable consequence of uncharged conspiracy of discharging a firearm at an occupied vehicle].)  Those cases are thus distinguishable and provide no support for Montgomery's position.

   Moreover, the factual circumstances of this case support a finding that torture was a reasonably foreseeable consequence of the conspiracy to commit residential burglary.  The evidence showed Washington, Wilson, and Montgomery were all armed with loaded handguns and zip ties when they entered the Hirts' home.  This demonstrated they understood someone may be home at the time of the burglary who could resist the taking of his or her valuables.  It was therefore reasonably foreseeable that one of

14

the crew would fire his gun, beat, and torture the occupant of the home to persuade the occupant to tell them where his or her valuables were in order to further the conspiracy to commit burglary.

Montgomery does not dispute this is a reasonable inference to draw. He instead presents an alternative theory as to why he and his coconspirators were armed. He posits a fearful or cautious burglar may bring a gun inside a residence to defend himself from the occupants' use of lethal force against him, not necessarily to persuade or coerce. That Montgomery can conceive of an alternative theory for bringing guns and zip ties into the home does not disprove that they might reasonably have been used inside the residence to physically harm the victims in order to coerce them to disclose the location of their valuables. " '[T]o be reasonably foreseeable '[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.) Here, torture was a consequence which was reasonably contemplated by the coconspirators.

**D. The Trial Court Was Not Required to Instruct the Jury on Assault by Means of Force Likely to Commit Great Bodily Injury or Felony Battery as Lesser Included Offenses of Torture**

Montgomery next asserts the trial court had a sua sponte duty to instruct the jury regarding assault by means of force likely to commit great bodily injury and felony battery as lesser included offenses of torture. We disagree.

While California law requires a trial court, sua sponte, to instruct fully on all lesser included offenses supported by the

15

evidence, there is no such requirement for lesser related offenses or offenses which are not necessarily included in the charged offense. (See *People v. Taylor* (2010) 48 Cal.4th 574, 622.)

Here, neither crime is a lesser included offense of torture. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456 (*Hamlin*) ["assault by means of force likely to produce great bodily injury is not a lesser included offense of torture."]; *People v. Lewis* (2004) 120 Cal.App.4th 882, 888 (*Lewis*) ["battery is not a lesser included offense of torture under either the elements test or the accusatory pleading test and the court was not required to instruct the jury on battery as a lesser included offense of torture."].)

Montgomery asserts *Hamlin* and *Lewis* were wrongly decided because torture merely requires the infliction of great bodily injury. According to Montgomery, any crime which inflicts great bodily injury, whether by use of force or not, is a lesser included offense of torture. We are unconvinced.

Both *Hamlin* and *Lewis* rejected this argument. *Lewis* reasoned, "The statutory definition of torture does not require a direct use of touching, physical force, or violence, but instead is satisfied if the defendant, directly or indirectly, inflicts great bodily injury on the victim. Thus, a defendant may commit torture without necessarily committing a battery." (*Lewis, supra,* 120 Cal.App.4th at p. 888.) Similarly, *Hamlin* explained, "Torture requires actual infliction of great bodily injury, but it does not require that the injury be inflicted by *any* means of force, let alone by means of force likely to produce great bodily injury. For example, a caretaker would be guilty of torturing an immobile person in his care if the caretaker, acting with the intent to cause extreme suffering for a sadistic purpose, deprived

16

that person of food and water for an extended period, resulting in great bodily injury to the person.  In such a circumstance, the caretaker would have inflicted great bodily injury without using any force and thus would not be guilty of committing assault by means of force likely to produce great bodily injury." (*Hamlin, supra,* 170 Cal.App.4th at p. 1456.)  We are persuaded by *Hamlin* and *Lewis* and follow their holdings.[6]  The trial court had no duty to instruct on these offenses.

## II.    The Trial Court Did Not Abuse Its Discretion When It Denied Montgomery's New Trial Motion

Lastly, Montgomery argues the trial court abused its discretion when it denied his new trial motion as to the torture convictions in counts 3 and 4.  Montgomery contends that since the trial court granted the motion as to Green, he should have received the same treatment.  Because the two held different roles in the home invasion robbery, we discern no abuse of discretion.

### A.  Proceedings Below

In his sentencing memorandum, Montgomery argued counts 3 and 4 must be vacated for lack of sufficient evidence. He later joined in Green's new trial motion as to the same counts. Green argued there was insufficient evidence as a matter of law

---

[6]    We note the court in *People v. Martinez* (2005) 125 Cal.App.4th 1035, 1043 stated in dicta that "an assault by means of force likely to produce great bodily injury is arguably an included offense within the crime of torture . . ."  However, as Montgomery concedes, *Martinez* did not decide the issue and we do not view this statement, which was made in passing with no analysis, to offer any precedential value.  In any case, we agree with the reasoning in *Hamlin,* as discussed above.

to prove she had the requisite knowledge, intent, or foresight required to aid and abet in the crime of torture.

The trial court granted Green's new trial motion as to the torture counts but denied Montgomery's. It explained:

"To say I've given a lot of thought to this is to not accurately convey the amount of thought I've given to this, and it's because of the seriousness of the charges that were found true by the jury, specifically with respect to counts 3 and 4, and how they impact Mr. Montgomery and Ms. Green.

"[¶] . . . [¶]

"[T]he jury made certain findings with respect to weapon use that were inconsistent, to say the least, with respect to the 12022.53 allegation. But they also made a finding with respect to the 12022.5 allegation concerning Mr. Montgomery and did not find that there was sufficient evidence that he personally used a firearm.

"That being said, Mr. Montgomery, the evidence established that the jury found [Mr. Montgomery] went into the home. . . . Mrs. Hirt testified that all three of the people who went into the home had guns, and one of those three people shot Mrs. Hirt. Two of the other people, it appears, beat up Mr. Hirt. The jury found that Mr. Montgomery is one of those people.

"So I don't see it as much as a natural and probable consequence situation with respect to Mr. Montgomery, rather as a direct perpetrator of the conduct either as the person who shot Mrs. Hirt or one of the two of them who beat up Mr. Hirt.

"Now, Ms. Stewart testified that it was Mr. Montgomery who shot Mrs. Hirt. The jury did not credit her testimony to make that finding beyond a reasonable doubt; but it was one of the three, according to the jury's finding. And I don't think that

18

their verdict with respect to him being one of the three was without substantial basis.

"So I see them in different situations. Ms. Green wasn't one of the people who went into the home. And as to her, there's a different issue with respect to the foreseeability of what went on in the house.

"And it's my job to look at the evidence in terms of what she knew when she was outside the home with respect to what was going on inside the home, and whether she knew that one of the perpetrators inside the home would use a firearm in the manner that he did, or whether the perpetrators inside the home would beat up Mr. Hirt in the manner that they did, or whether the perpetrators inside the home intended to commit torture.

"Because as an aider and abettor, the jury had to have found that she knew that a perpetrator intended to commit torture. And I'm focusing on counts 3 and 4, because I think those are the ones that are really in issue.

"[¶] . . . [¶]

"And then finally, with respect to Ms. Green, whether or not torture was a natural and probable consequence of the conspiracy in which the jury found she participated. So I see it differently between the two of them.

"And I quite frankly don't think that there was sufficient evidence with respect to Ms. Green on counts 3 and 4 to justify the jury's verdict. I am not finding that as a matter of law. I'm finding that the evidence was not sufficient to justify a verdict.

"And I'm granting the motion for new trial on counts 3 and 4 as to her. And I'm denying it as to counts 3 and 4 as to Mr. Montgomery."

**B. Standard of Review**

A trial court may grant a new trial "[w]hen the verdict or finding is contrary to law or evidence . . ."  (§ 1181, subd. (6).) A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised its discretion.  (*People v. Davis* (1995) 10 Cal.4th 463, 524.) " 'The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears.' "  (*People v. Williams* (1988) 45 Cal.3d 1268, 1318, abrogated on a different ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; accord *People v. Carter* (2005) 36 Cal.4th 1114, 1210; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 128.)

**C. Analysis**

Montgomery asserts the trial court abused its discretion when it denied his motion for a new trial.  So far as we can discern, his argument on this subject attempts to refute the reasoning articulated by the trial court.[7]  Montgomery appears to argue there was insufficient evidence he was the direct perpetrator who shot Diana because the jury found him not guilty of count 39, which alleged possession of a firearm by a felon, and found not true the allegation that Montgomery personally used a handgun in count 3, which alleged the torture of Diana.

---

[7]    The entirety of his argument spans two pages in his 49-page opening brief, including a recitation of the procedural background, and another two pages of his reply brief.  His arguments are not fully developed.  For example, he argues a limited remand should be ordered, but fails to explain what further proceedings are necessary.

According to Montgomery, and contrary to what the trial court believed, his culpability for the nontarget offense of torture arose only if torture was the natural and probable consequence of the target offenses of conspiracy to commit residential burglary or home invasion robbery. Therefore, Montgomery asserts the trial court was wrong when it distinguished his and Green's circumstances. Montgomery asserts he was "in the same position as Green" as a coconspirator and not a direct perpetrator. Given his parity with Green, he argues he should have also been granted a new trial. We disagree.

First, the jury's firearm findings do not contradict a finding that Montgomery was one of the individuals who beat Samuel rather than the individual who shot Diana. Further, the trial court explained very cogently the difference between Green and Montgomery. Green was the driver, who never entered the Hirts' residence. Montgomery, on the other hand, entered the Hirts' residence and either participated in shooting Diana or beating Samuel. It was not reasonably foreseeable for the driver who was located outside of the home to "kn[o]w that one of the perpetrators inside the home would use a firearm in the manner that he did, or whether the perpetrators inside the home would beat up Mr. Hirt in the manner that they did, or whether the perpetrators inside the home intended to commit torture." On the other hand, as discussed above, the factual circumstances of this case support a finding that torture was a reasonably foreseeable consequence of the conspiracy to commit residential burglary or home invasion robbery for someone like Montgomery, who had entered the Hirts' home with two other people armed with guns and plastic ties. In sum, we find the trial court did not abuse its discretion when it denied the new trial motion.

21

In his reply brief, Montgomery argues the trial court applied an erroneous legal standard when it granted Green's new trial motion. Montgomery asserts the trial court erred when it found insufficient evidence to support Green's conviction for the unplanned crime of torture in counts 3 and 4 based on what she knew as the driver, rather than what a reasonable person would know. Montgomery argues foreseeability of the unplanned crime must be viewed from an objective standpoint, not a subjective one. (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739 ["The question whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime 'is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable.' "].)

We fail to see how this argument helps Montgomery. Whether the trial court improperly granted Green's new trial motion based on an erroneous legal standard has no relevance to whether Montgomery's motion was properly denied.

## DISPOSITION

The judgment is affirmed.

BIGELOW, P. J.

We Concur:

GRIMES, J.          WILEY, J.

22